UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA

IN RE:                        .     Case No. 06-62966(PWB)
                              .
                              .
                              .
INTERNATIONAL MANAGEMENT .          75 Spring Street SW
ASSOCIATES, LLC, et al., .          Atlanta, Georgia  30303
                              .
                              .
          Debtors.         .        September 3, 2009
. . . . . . . . . . . . ..           10:09 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE PAUL W. BONAPFEL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plan Trustee:     Kilpatrick Stockton LLP
                          By: COLIN M. BERNARDINO, ESQ.
                          1100 Peachtree Street, NE
                          Suite 2800
                          Atlanta, GA 30309

For the Official          McKenna Long & Aldridge, LLP
Committee of Investors:   By: MARK S. KAUFMAN, ESQ.
                              BRIAN E. BATES, ESQ.
                          Suite 5300
                          303 Peachtree Street, NE
                          Atlanta, GA 30308

Audio Operator:           Cheryl Goss

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

2

APPEARANCES(CONT'D):

For Scott Baker and          Nixon Peabody, LLP
David Laird:                 By: TIMOTHY W. MUNGOVAN, ESQ.
                                 JOSHUA BARLOW, ESQ.
                                 JONATHAN SABLONE, ESQ.
                             100 Summer Street
                             Boston, MA 02110

For Keith Burks,             Sutherland
James Shelton,               By:  JUANITA PASSYN, ESQ.
Cornell Shelton              999 Peachtree Street NE
TBC Capital, Inc.:           Atlanta, GA 30309

For David Wisneski           Lamberth, Bonapfel, Cifelli, Stokes,
and Michelle Wisneski:       Ellis & Nason, P.A.
                             By: CHRISTOPHER PHILLIPS, ESQ.
                             East Tower Suite 550
                             3343 Peachtree Road NE
                             Atlanta, GA 30326

For George and Kelsey        By: AKIL SECRET, ESQ.
Wright:                      4153 Flat Shoals Parkway #B
                             Decatur, GA 30034

For Mr. Jeffries:            Kitchens, Kelly Gaynes, PC
                             By:  HEATHER BROWN, ESQ.
                             3495 Piedmont Road NE
                             Suite 900
                             Atlanta, GA  30305

For Dr. Randolph and         KEVIN STEIN, ESQ.
Laverne Hamilton Jones:

For Renee Withers and        Steinfeld & Steinfeld, PC
Bruce Withers:               By: SHAYNA M. STEINFELD, ESQ.
                             31 Lenox Pointe NE
                             Atlanta, GA 30324

For Mount Eagle Baptist      Gregory T. Bailey & Associates
Church:                      By:  GREGORY T. BAILEY, ESQ.
                             571 Culberson Street
                             Atlanta, GA 30310

For Atlanta Perinatal        Fryer, Shuster & Lester, P.C.
Associates:                  By:  JEFFREY A. POWELL, ESQ.
                             1050 Crown Pointe Parkway, Suite 410
                             Atlanta, GA 30338

**J&J COURT TRANSCRIBERS, INC.**

Appearances(cont'd):

For William T. Perkins:          RODNEY T. EASON,ESQ.
                                 6150 Old National Hwy
                                 Atlanta, GA 30349

For Experts Investment           Jonathan H. Fain & Associates
Club LLC:                        By:  JOHN FAIN, ESQ.
                                 2024 Beaver Ruin Road
                                 Norcross, GA  30071

For Marco Coleman:               Epstein Becker & Green, P.C.
                                 By: TARA N. EVANS, ESQ.
                                 Resurgens Plaza
                                 945 East Paces Ferry Road
                                 Suite 2700
                                 Atlanta, GA 30326

For Gregory and Lawrence         CATOSHA WOODS, ESQ.
Cooper:


                                 VALERIE PEOPLES, PRO SE


**J&J COURT TRANSCRIBERS, INC.**

4

1          DEPUTY CLERK:  Okay.  We're here on the International

2    Management Associates case, Case Number 09-00601, assigned

3    number for the Trustee's For Value matters.

4          THE COURT:  Parties ready to proceed?

5          UNIDENTIFIED SPEAKER:  We are, Your Honor.

6          THE COURT:  I've got a luncheon that I have to go to

7    at 11:45 which is here in the building, so that's when we'll

8    take out lunch break just so everybody is aware of that.  Maybe

9    we'll be finished by then.  I don't know how long you all

10   intend to take.  So anyway, go ahead.  Mr. Kaufman, are you

11   going to start?

12         MR. KAUFMAN:  Yes, I am.

13         THE COURT:  Go ahead.

14         MR. KAUFMAN:  Would you like appearances of counsel?

15         THE COURT:  Sure.

16         MR. KAUFMAN:  Mark Kaufman and Brian Bates both of

17   McKenna Long & Aldridge on behalf of the Investors Committee.

18   And also here on behalf of the Trustee to argue the matters of

19   For Value.  And also at the table today is Mr. Rick Bell who is

20   with Trial Graphics who is here to assist in the presentation

21   of our Power Point and sort of keep me from going astray.

22         THE COURT:  Okay.

23         MR. BERNARDINO:  Your Honor, Colin Bernardino,

24   Kilpatrick Stockton, also on behalf of the Plan Trustee today.

25   Although Mr. Kaufman will be I guess taking charge with the

**J&J COURT TRANSCRIBERS, INC.**

5

1  argument.

2           MR. KAUFMAN:  The Plan Trustee is also here, Mr.

3  Perkins.

4           THE COURT:  Okay.

5           MR. MUNGOVAN:  Good morning, Your Honor.  Timothy

6  Mungovan from Nixon Peabody together with my colleagues Joshua

7  Barlow and John Sablone.  We represent the Laird's, David

8  Laird, Debra Laird and the Laird Family Trust, the Curtis',

9  Russell Curtis, Betty Curtis and the Russell Curtis Trust.  We

10 will be speaking on behalf of what we'll call the joint defense

11 group for approximately half of the argument, Your Honor.

12          THE COURT:  Okay.

13          MS. PASSYN:  Your Honor, Juanita Passyn.  We

14 represent -- from Sutherland.  We represent Keith Burks, James

15 Shelton, Cornell Shelton and TBC Capital, Incorporation in five

16 separate adversary proceedings, but today we'll be speaking --

17 I'll be speaking after Mr. Mungovan on behalf of the Joint

18 Defense Group.

19          THE COURT:  Okay, thank you.

20          MR. PHILLIPS:  Good morning, Your Honor.  Chris

21 Phillips on behalf of the defendants David Wisneski and

22 Michelle Peoples Wisneski.  I expect to make a very short

23 presentation regarding issues particular to my client.

24          THE COURT:  Okay, thank you.

25          MR. SECRET:  Akil Secret, Your Honor.  I'm here on

**J&J COURT TRANSCRIBERS, INC.**

6

1  behalf of George Wright and Kelsey Wright.  And with the

2  Court's permission I would simply join in the argument of the

3  Joint Defense Group.

4           THE COURT:  Okay, thank you.

5           MS. BROWN:  Good morning, Your Honor.  I'm Heather

6  Brown.  I represent defendant (indiscernible) Jeffries and I'm

7  part of the Joint Defense Group and I do not anticipate making

8  any additional argument today.

9           THE COURT:  Okay, thank you.

10           MR. STEIN:  Good morning, Your Honor.  Kevin Stein.

11  I represent Doctor Eric Randolph and Laverne Hamilton Jones.

12  My clients are also part of this Joint Defense Group and I'll

13  be joining in their argument today.

14           THE COURT:  Okay, thank you.

15           MS. STEINFELD:  Your Honor, for the record Shayna

16  Steinfeld.  I have defendants Renee Withers and Bruce Withers

17  and I'm more here monitoring.

18           THE COURT:  Okay, thank you.

19           MR. BAILEY:  Good morning, Your Honor.  I'm Greg

20  Bailey for Mount Eagle Baptist Church and I'll be here

21  monitoring, as well.

22           MS. PEOPLES:  Good morning, Your Honor.  I'm Valerie

23  Peoples.  I'm representing myself pro se.  I'm a member of the

24  Joint Defense team, as well as well as issues that are unique

25  to myself regarding any other matters that arise during our

**J&J COURT TRANSCRIBERS, INC.**

7

1  conversation.  Thank you.

2             THE COURT:  Okay, thank you.

3             MR. POWELL:  Good morning, Your Honor.  Jeff Powell.

4  I'm here on behalf of Atlanta Perinatal Associates, Dexter

5  Page, Brad Bootstaylor, Carol Brownee (phonetic), Cyrinthia

6  Andrews and Alicia  Walker.  That's Adversary Proceeding Number

7  08-06185.  And we are also part of the Joint Defense Group and

8  will just be joining in the argument of defense counsel.

9             THE COURT:  Okay, thank you.

10            MR. EASON:  Good morning, Your Honor.  Rod Eason on

11 behalf of William T. Perkins, not to be confused with William

12 F. Perkins.  We may have comments.  Quite frankly, we'd like to

13 se exactly what's said and we reserve the right to just make

14 comments sometime toward the end.

15            THE COURT:  Okay, thank you.

16            MR. FAIN:  Good morning, Judge.  John Fain on behalf

17 of -- excuse me --  Experts Investment Club LLC, also local

18 counsel for Nixon Peabody.

19            THE COURT:  Thank you.

20            MR. FAIN:  Part of the Joint Defense Group, also.

21 Sorry.

22            THE COURT:  Okay.

23            DEPUTY CLERK:  We've got a couple on the phone, but I

24 don't know if they're just monitoring or want to be heard.

25            THE COURT:  Well, let's find out who's on the phone.

**J&J COURT TRANSCRIBERS, INC.**

1             MS. WOODS:  Your Honor, Catosha Woods representing

2   Gregory and Lawrence Hooper, and I'm also with the Joint

3   defense Group.

4             MS. EVANS:  And I'm Tara Evans with Epstein Becker &

5   Green.  We represent Marco Coleman and we're just monitoring

6   today.

7             THE COURT:  Okay, thank you.  Okay anyone else?

8                     (No audible response)

9             THE COURT:  Go ahead.

10            MR. KAUFMAN:  May it please the Court, let me just

11  deal with a couple ground rules.  I think we have an

12  understanding with the Joint defense counsel as to how we're

13  going to proceed, but essentially I'm going to make the

14  arguments on the so-called For Value issue then as indicated

15  Mr. Mungovan and his colleagues and the Sutherland Firm will

16  then divide up -- and that's fine with us -- divide up their

17  response argument, we'll make a reply.

18            There are some ancillary arguments.  Mr. Woods -- Mr.

19  Philips referred to that.  And maybe some others have some

20  other arguments that are not directly germane that are perhaps

21  unique to one or others.  If they're not covered by the

22  comments that I make, in other words if they're not satisfied

23  that we're not trying by today's matter to adjudicate anything

24  specific that may be unique to a particular party or to address

25  an issue, then obviously that can come up later.  We'll have

9

1  that as sort of a followup round of discussion so that we stay

2  sort of centered on the issues of For Value and whether that's

3  a problem for the defendants or not.  And then these other sort

4  of side issues -- not to be pejorative about it -- can be

5  addressed subsequently if necessary.

6        THE COURT:  Well I'll just state generally, I'm not

7  intending to resolve any issues other than the For Value

8  motion.

9        MR. KAUFMAN:  Right.  And we're not intending to have

10  it resolved so I think there's a harmony.  There is, for

11  example, one issue that some -- a couple of parties have

12  raised, I think actually Mr. Philips has raised, about whether

13  if For Value as the theory expressed by the Trustee doesn't

14  work they'd like to get their profit back.  It wasn't our

15  intention that that be part of the motion.  If Your Honor is

16  not going to hear that today and is going to afford the

17  parties the opportunity to brief that issue as if and when it

18  were to be the case that we were not to prevail and they were

19  -- those who are the defendants were actually going to seek to

20  get back -- or to hold on to profit, as well.  That could be

21  for a separate day and a separate round.

22        THE COURT:  Well I don't see the profit issue as

23  being before the Court today.

24        MR. KAUFMAN:  Okay.  That is our view, as well.  And

25  so that --

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  If somebody else has a different view

2  that it is I'm happy to take that up, but my understanding is

3  that the motion is limited to whether or not the For Value

4  defense is available with regard to the return principle.

5        MR. KAUFMAN:  Right, that is the issue.  All right,

6  thank you, Your Honor.  With that let me start -- and I'm going

7  to use just an outline to keep myself sort of on focus as Your

8  Honor --

9        THE COURT:  I guess I would make this observation, if

10  it's not available for the return principle it would not be

11  available for the amounts in excess.

12        MR. KAUFMAN:  That is our view.  In  other words, if

13  we prevail then --

14        THE COURT:  But the fact that it is not -- the fact

15  that it is available for principle does not necessarily

16  determine the issue on the excess amounts.

17        MR. KAUFMAN:  Right.  And we briefed it as such and

18  basically said we think, in a way, it's for another day.  And

19  in part without prejudice to any of the parties on the other

20  side since he whole matter hadn't been briefed by everybody I

21  think that is for another day and it will be moot if we

22  prevail, but if we don't prevail then it's ripe for a separate

23  adjudication.  Your Honor, you've known me for a long time so

24  you know that I have one thing that I do do that will move this

25  ahead which is I talk fast.  On the other hand I think I would

**J&J COURT TRANSCRIBERS, INC.**

1  be as neutral as I can to say that I'm not gifted in brevity.

2  But that said, I will attempt to speed through this as fast as

3  I can.

4          We have two volumes -- they're each the same -- of

5  the matters.  We've provided them to counsel, like 15 sets of

6  them to as many as we could and maybe they can share, but these

7  are one for the courtroom deputy and for Your Honor.

8          THE COURT:  Let Ms. Harrow (phonetic) use the

9  courtroom deputy one temporarily.

10          MR. KAUFMAN:  Okay.  We have an extra one, Your

11  Honor, that -- Ms. Goss, would it be helpful.

12          THE COURT:  Are you introducing this into evidence?

13          MR. KAUFMAN:  No, this is a demonstrative.

14          THE COURT:  Yes.

15          MR. KAUFMAN:  All this is is demonstrative matters

16  just to follow along and essentially --

17          THE COURT:  Is it part of --

18          MR. KAUFMAN  -- consistent with Local Rule all we're

19  doing is we've provided this to everybody because there's --

20  anything I'm referring to that's going to be up on the screen

21  is contained.  This may over contain a bunch of stuff.

22  Hopefully it does since I don't intend to show that many pages

23  on the screen.  But this is the volume from which materials

24  come from.

25          THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

12

1              MR. KAUFMAN:  All right.

2              THE COURT:  That's fine.  I guess my question is is

3    this part of -- do you want this to be part of the record?

4              MR. KAUFMAN:  To the extent Your Honor wants to refer

5    to it.

6              THE COURT:  I can refer to things without it being

7    part of the record.

8              MR. KAUFMAN:  Right.  So I don't think it is part of

9    the record.

10             THE COURT:  The question is -- and it doesn't look

11   like there's anything here that's not part of the record except

12   the Power Point presentation.

13             MR. KAUFMAN:  Yes.  The Power Point presentation and

14   some cause authorities.

15             THE COURT:  Because all of these --

16             MR. KAUFMAN:  There are a couple of case authorities

17   in there, but -- and you know, obviously the Court has the

18   ability to look.  So this is just a handy reference tool.

19             THE COURT:  But all the subscription agreements,

20   those are already part of the record, right?

21             MR. KAUFMAN:  That's correct.  These are just

22   examples of them just to illustrate a point or two.

23             THE COURT:  Okay.

24             MR. KAUFMAN:  Okay.

25             THE COURT:  So when you take it up on appeal you can

**J&J COURT TRANSCRIBERS, INC.**

13

1  reproduce whatever part of this or other parties can as

2  appropriate.

3           MR. KAUFMAN:  Correct.

4           THE COURT:  Okay.

5           MR. KAUFMAN:  I hope you don't mean when -- when one

6  takes it up on appeal.

7           THE COURT:  Well, I'm assuming it's going up by

8  somebody or the other.

9           MR. KAUFMAN:  Right.  I wasn't reading anything more

10 into it than that for now.  Your Honor, let me go over the

11 outline very briefly where going and I think that will sort of

12 keep us on track.  I want to talk first about the events and

13 decisions that preceded the motion.  There was obviously a

14 history of this case for a couple years that preceded where we

15 are today and I want to briefly highlight that because I think

16 it forms an appropriate backdrop.

17          Second, I want to talk very briefly about what it is

18 -- and I think the Court well understands the goal of what

19 we're saying and sort of the thrust of the relief we're

20 seeking.  Third, I'm going to briefly review the appropriate

21 statutory framework.  I'm going to talk about the fact that the

22 IMA investors indeed were by the documents that they signed

23 equity holders.  There may be a couple, not for today, that

24 have unique circumstances, but the bulk of the people and I

25 think virtually all the people here signed those agreements and

14

1  I think are bound by the fact that they signed them as equity.

2       Fifth, I want to talk about the Ponzi scheme --

3  outside of the Ponzi scheme how courts deal with distributions

4  to equity holders that are not ratable.  Then I'm going to

5  compare that in the next section that what happens in the

6  conventional Ponzi scheme case where there's a fraudulent

7  transfer and why those cases don't apply in the history of --

8  or what we call the lore -- don't apply to the Ponzi scheme

9  case and that the Ponzi scheme cases are essentially

10 replicating what happens in the non Ponzi scheme cases and

11 shouldn't be dealt with differently.

12      The crux of the argument is going to be the seventh

13 point which is we're going to refer to law that's applicable

14 both from the Bankruptcy Code and from common law principles,

15 whether they are due process principles or equity debt

16 distinctions under state law, and demonstrate that the totality

17 of all that red can't lead to the result that the defendants

18 would argue that they can justify the For Value defense under

19 these circumstances.

20      And then finally the eighth point, I'm going to

21 rejoin the notion that somehow the contention that the Trustee

22 is quixotic arguing on the one hand that the parties who are

23 tort victims are creditors and on the other hand equity holders

24 and that somehow or never the twain and that we're somehow

25 either as a matter of res judicata precluded which I think is

**J&J COURT TRANSCRIBERS, INC.**

1  not a fair at all read of what we did in the explicitness.  But

2  second and to the point, the fact that the parties are at one

3  time equity doesn't preclude their being treated as creditors

4  today for purposes of satisfying any requirement that there

5  exists creditors, be that under <u>More v. Bay</u>, <u>Whiteford Plastics</u>

6  or the General Notions of Insolvency under 548(b) with regard

7  to a constructive fraud.

8          So with that let me turn to the history and say that

9  -- to quote I think Crosby Stills & Nash if I'm right, "it's

10  been a long time coming."  We started this in 2006 with the

11  formation of an investors committee and soon thereafter

12  recognized that there were indeed issues about whether the

13  treatment that had been accorded to some of the people who had

14  been victims of Mr. Wright's Ponzi were sitting with a bag full

15  of -- getting their money back fortuitously, not through fault

16  of theirs, while others were sitting empty-handed and those

17  were primarily the people on our committee.

18          Now there were people on the committee that were sort

19  of -- not pejoratively again -- hydro headed in the sense that

20  they had gotten some of their money back and not the bulk of

21  their money back.  And we basically had to form a sub committee

22  and it got into sort of a protracted matter and don't need to

23  recite it here.  But we dealt with the U.S. Trustee to make

24  sure that we had a neutral committee of people who were simply

25  investors who hadn't gotten their money back so that they could

1  make a determination of what to do because the parties who had

2  gotten some of their money back below the "high water mark"

3  which was the measure had a potential claim against them and

4  obviously couldn't participate in that process.

5         So ultimately we reached that point and ever since

6  reaching that point have been moving toward the day that we'd

7  be here arguing that there ought to be a ratable distribution

8  and that we needed to rescramble the egg, if you will, and be

9  Robin Hood in the sense of taking from some who had gotten and

10 giving it to those who had not.  When we face that we obviously

11 recognize and recognize today that this is not a happy

12 situation for anybody and quite frankly it's with that in mind

13 that we came up with the idea of the plan.

14        It all depends -- and this is the part where I'll

15 leave the law for a minute and just reflect on this because

16 I've talked about it to umpteen people, whether involved in

17 this case or not, and you obviously come away with the notion

18 of why are you not letting sleeping dogs lie and then on the

19 other hand if you're there amongst a group of people who have

20 lost their money they're saying why if I invested this equity

21 do I not get my money back when the guy next door

22 serendipitously got his or her money back.

23        And so you can look at it and say well depending on

24 which perspective you come from both of them have right

25 feelings.  You can then get into the question of am I my

**J&J COURT TRANSCRIBERS, INC.**

1  brother's keeper, should I go about trying to make things even

2  or am I out there to protect me and my family and that's right.

3  You can do all those debates, and we did all those debates, but

4  at the end of the day the question is is there law that ought

5  to order what otherwise are moral or philosophical judgments or

6  prospective judgments and harmonize them somehow.  And when we

7  went to look I found that the law in the area of equity cases

8  as opposed to debt Ponzi scheme cases was virtually nonexistent

9  and therefore -- and then looked at the whole body of equity

10  law and found that equity law as I had always learned it talks

11  about ratability, a totally different concept than creditor

12  status.

13         So it was with that that we proceeded ahead and as we

14  did we concluded that indeed we had a very meaningful case and

15  one that as a fiduciary we had to bring.  So that then led to

16  the plan.  The plan was an effort to say listen, this is an

17  unsettled area.  Admittedly we think we are right, admittedly

18  we think that the other aside doesn't have a compelling

19  argument as to why the so-called transmutation of their claim

20  -- of their equity into debt can work, but recognizing it was

21  uncertain and recognizing that we were causing a change, a

22  dynamic change, in a way no different than the change that was

23  wrought on those who've had nothing when they woke up one day

24  to realize they had nothing we were going to have to go in and

25  resort and redivi if we were correct.

**J&J COURT TRANSCRIBERS, INC.**

1    And so we said listen, we'll provide a plan that

2   allows people to get out before Your Honor turns a card, and

3   that's exactly what the plan was about.  It was volitional.  It

4   didn't mandate that people did it.  It just gave them an

5   opportunity to say if they didn't want to walk the plank and

6   take the chance that they win or lose they could get out and

7   they could get out for ten cents on the dollar and a nominal

8   basis.  When I say nominal I don't mean ten percent was nominal

9   in its percentage.  That was the amount that they had to

10  disgorge of what they had gotten below their high water mark.

11  But on the other hand while that was the amount that they had

12  to give up they were also relegated on the distribution such

13  that they wouldn't start receiving money until the

14  distributions got down to the percentage of what the size of

15  their claim was.  So it had a aggregating effect and would

16  actually have more impact than merely ten percent.

17    We went through all the math of that.  That was the

18  formula.  We've settled.  We've now settled for roughly about

19  $3 million, most of which has been collected.  There's another

20  20 or 25 million of people who chose not to and they're the

21  defendants before the Court today.  But to the extent the

22  Trustee was saddled with the issue is this fair, the investor

23  committee salvaged whether it is fair, we acquitted the

24  fairness issue as best we could in that fashion and now we're

25  proceeding with the law as we think it is.  So that's the first

**J&J COURT TRANSCRIBERS, INC.**

19

1   point.

2           Then what I wanted to also say is we are not

3   obviously dealing with other issues as Your Honor alluded to.

4   We're not dealing with a statute of limitations here today,

5   we're not dealing with good faith.  Indeed this whole

6   proceeding was intended to avoid any issues of good faith that

7   would obviously have to be decided on what each individual knew

8   and would lead to a protraction of proceedings.  And we are

9   obviously desirous of circumventing this is the For Value

10  wasn't going to be available because, as we'll get into in the

11  statute, you have to satisfy both in order to have a t548

12  defense.

13          Today is also not the day where we're dealing with

14  whether this is a Ponzi scheme.  I think the defendants are

15  entitled to a day in court if they want to.  It's in a way sort

16  of if they got their money back because they're asserting there

17  was a fraud I don't know how they're going to argue that there

18  wasn't a Ponzi scheme.  But be that as it may, that's the

19  burden that the Trustee has.  It is for another day.  We're

20  assuming it to be the case for argument, but it's subject to

21  the rights of the parties to want to challenge that and when it

22  started.  And that again for another day.

23          So the purpose.  The purpose today obviously is to

24  look at getting this equal treatment among what we think are

25  defrauded equity investors and they best way we can.  To the

extent people pay back in then they'll have claims, to the

extent they don't then we'll need the assistance of this Court

to figure out what we do about those who aren't going to pay in

terms of either putting them completely out or way down under

-- in an appropriate way under any distribution right, but

presumptively if people have, we're going to want to enforce

the claims and recover it and use it to distribute to all

people pursuant to the plan on a ratable basis which is what

the plan provides.

So that part is pretty simple and straightforward,

which takes us to -- well I should say the thrust of the

argument today is that the exchange made at the time the

parties got their money back in exchange for giving back their

certificate wasn't reasonably equivalent in value; and second

that they can't use the legal fiction that it was in

satisfaction of a tort claim that they say arises -- and we're

not disputing it arises -- at the time that they first

invested.  And we'll come back to that and why that is the fact

that we're acknowledging that there is a claim that arises when

it did doesn't change the operative result that we're seeking.

So we start -- let's look now at the statutory

framework, which is pretty simple, and I'm sure that we can run

through this pretty quickly because the Court is fully ware of

this having been at this for as long I think as I have and

these are not much in debate.  So we have an actual fraudulent

conveyance.  I'm not going to spend time today dealing with

constructive fraud.  It requires obviously the insolvency and

the value issue which is imbedded here on the defense side, as

well, so it's essentially the same issue as other courts have

found.

        But we need only deal with the actual fraud because I

think the Ponzi scheme is unassailable that there was an actual

intent.  The cases say Ponzis are presumptively actual intent

to delay, hinder and defraud, both under you'll see the

548(a)(1) Federal Law which now is two years, but at the time

was applicable for one and under the strong-arm clause through

the UFTA adopted in 2002, same language and we have a four year

statute, but it's told due to non knowledge so we get into

another day the statute of limitations and how far back we can

look.  But those are the actual fraud provisions.

        And then we turn to what's the defense and we

obviously know that the operative defense is found in 548(c),

transferee takes For Value and conjunctive in good faith.  And

I don't think there's any question but that conjunctive needs

to be satisfied.  we park to another day if necessary the issue

of good faith so we're here on the question of value.

        And then finally where the nub of the issue is going

to center 548(d)(2)(a) describes the notion of value and it

means either property, which has always been determined to mean

reasonable equivalence in value, or -- and here's the rub in

22

1  the nub of today's case -- satisfaction or securing of a

2  present or antecedent debt.  And what the contention is on

3  behalf of the defendants is that when they got their money back

4  it was in satisfaction of a unarticulated, but nevertheless

5  extant antecedent debt of the debtor and therefore value is

6  satisfied even though what they gave back was not reasonably

7  equivalent.  All right.  With that we obviously are going to

8  look at the issue of value exchange at the time of redemption.

9  I don't think there's any question --

10         THE COURT:  Well, let me ask you this because your

11  Power Point raises the question and I wonder.

12         MR. KAUFMAN:  Sure.

13         THE COURT:  Is the -- the same issue exists under the

14  Georgia Law, right?

15         MR. KAUFMAN:  Yes.  I mean to say that.  Correct,

16  Your Honor.

17         THE COURT:  Is it the same issue?

18         MR. KAUFMAN:  Exactly the same issue.  No different.

19         THE COURT:  Does Georgia Law govern both of those

20  issues?

21         MR. KAUFMAN:  Does Georgia Law govern both --

22         THE COURT:  The value issue, this issue right here.

23         MR. KAUFMAN:  Well federal law would govern to the

24  extent you have a fraudulent conveyance in the first year.

25  Georgia Law would govern any of the strong-arm look backs.  So

**J&J COURT TRANSCRIBERS, INC.**

we're looking at the same language.  And by the way, there's
ample case law that says when the language in the state statute
is in the same words as in the Bankruptcy Code the federal
precedents in the bankruptcy area interpreting the same
language is applicable.  So I think the whole body of case law
that we're talking about is going to apply one way or the other
here, whether we're looking at this For Value as a state law
matter or a federal law matter.

And we found nothing in the Georgia State Law on this
point that -- you know, while fascinating to us it's probably
been obscured over history otherwise.  So the issue of -- which
is not the issue of reasonable equivalence in value or whether
value means for and on account of property or antecedent debt,
but rather whether there are any cases that deal with this
transmutation without articulation, so to speak, which is what
we're talking about.

So we look now at the time of the redemption.  We're
not -- obviously at the time of the original transaction there
was monies paid and they got share certificates either from the
limited partnership or the limited liability company, but we're
looking at the time of the redemption as the central focal
point.  And it's also clear that you can't make the argument
that well here's my share certificate that I got when I gave
you my $1 million so I'm giving it back, give me back my $1
million.  You have to look at the value of the certificate at

24

1   the time and if the shares are essentially worthless the fact

2   that you're handing bac the certificate is a value by any, you

3   know, stretch or any case law that would support that

4   proposition.

5          So the next question is are we dealing with equity.

6   We need to cover that and satisfy that this is equity because

7   if they were creditors to begin with then they would have an

8   antecedent debt from the get go and we wouldn't be here making

9   this argument.  I might add as an aside -- and I think this is

10  relevant -- I do not think that in the Madoff case and in

11  Stanford that the investments -- and while we haven't heard

12  this argument as sort of an explanation of why, we're equity

13  investments.  You know, ever situation is different.  I had

14  thought that perhaps Madoff and Stanford were going to be like

15  this.  There are a host of other Ponzi scheme cases that were

16  structured intentionally as equity.  The Madoff and Stanford

17  were not.

18         The results in those case may be different because

19  those people basically set up demand deposit accounts, if you

20  will.  In our case it was equity.  In other cases it's equity.

21  And a lot of the hedge fund cases were set up -- a lot of hedge

22  funds, not cases -- but in a lot of hedge funds the structure

23  of those deals was set up as limited partner or limited

24  liability investments.  That's because what the hedge fund

25  managers didn't want to do was have the risk of being thrown

**J&J COURT TRANSCRIBERS, INC.**

1  into bankruptcy by creditors so they made them equity holders

2  and limited partners don't have the rights.  So absent getting

3  some independent fiduciary to come in and take over the estate

4  the ability for unhappy investors who are equity to get in and

5  do anything about it is problematic.  And that was in my view

6  clearly a design focus of these hedge funds to begin with.  And

7  in our case specifically this was set up that way.

8  So let me just be brief about it because I don't want

9  to go at long length.  But I don't think there's any question

10  when one looks at the subscription agreement, the offering

11  memorandum or the actual documents that were signed.  This is

12  in the subscription agreement, new limited partner desires to

13  become a limited partner.  Okay that's one example.  The next

14  is -- we're going to go fast here -- in the subscription

15  materials purchasing a membership interest -- I'm dealing with

16  -- I'm going to deal with these in the membership.  Some of

17  these were LLCs and others were LPs, virtually the same

18  language.  All of the people who subscribed subscribed to one

19  of the other.  Why IMA set some of them up as LLLCs and

20  LCs(sic) that's committed to somebody else's history, I don't

21  know.  But they were all set up one way or the other as equity

22  investments.

23  Okay, next is the offering memorandum talks about

24  membership interests.  It's a limited liability company.  Next

25  is investments in limited partnerships.  This is partnership

1 agreement.  This is in the offering memorandum in that one.

2 And then we get to the actual documents -- this is the offering

3 -- actually in that same document, as well, offering limited

4 partnership interest.  We turn then to I think the actual

5 agreements themselves.  This is part of the actual subscription

6 agreement.  It's the LLC agreement, excuse me.  Member means

7 person that has entered into a subscription agreement that is

8 accepted by the manager and is named a member of the company in

9 its books.

10        Capital contribution.  Obviously that doesn't happen

11 in a debt situation.  They're doing that.  And then beneficial

12 membership interest in the company.  This is in units in the

13 LLC.  Each unit shall be identical in all respects with ever

14 other unit.  Undivided beneficial interest in the company.

15 None shall have priority.  And then allocations in proportion

16 to their capital accounts.  These are all standard provisions

17 that talk, walk and look like equity.  Next -- and here

18 significantly in the liquidation context -- the proceeds of

19 liquidation shall be distributed first to creditors, then on a

20 ratable basis to members in proportion.

21        So that's what they signed, that's what they're bound

22 by and that's what distinguishes this case from cases which are

23 debt.  So with equity nature having been established I want to

24 look next to the non Ponzi scheme scenario, in other words a

25 scenario where under stats law without any inceptive fraud

1  having been committed by the party who gathers the capital into

2  the estate there's a distribution that's made.  So we're going

3  to talk about this outside the Ponzi scheme situation.  And I'm

4  going to talk about a hypothetical which we have on the board

5  here and that's in the materials.

6          Let's assume we have ten people who become equal

7  equity members of a limited liability company, each contributes

8  a million dollars so there's $10 million of total paid in

9  capital and the fair market vale of that at the time the

10  company hasn't started is $10 million.  Everybody owns

11  one-tenth -- obviously this is tautological -- and have $1

12  million each.  All right.  Then over a period of time due to

13  operations and whatever the LLC still has net equity value, you

14  know, on some kind of enterprise basis it's valued, and it's

15  still on the particular day in question, nevertheless has

16  declined such that the fair market value of the company

17  properly determined through appropriate valuation is $3

18  million.

19          Each member share obviously would then be worth

20  $300,000, but on a particular occasion one member without any

21  fraud on its part -- and let's presume whether there's a badge

22  of fraud in the transaction or not doesn't matter -- one member

23  comes in and says listen, I really got some need for some

24  money, please give me my million dollars back and the principal

25  of the company gives them back their $1 million.

**J&J COURT TRANSCRIBERS, INC.**

1    Here's the operative point.  Even without considering

2    fraudulent conveyance law 700,000 of that transfer would be

3    actionable under limited liability law, limited partnership

4    law, corporate law, all of those, as an unlawful non-ratable

5    distribution because it violates the notion that's inherent  as

6    you saw in the LLC and LP documents themselves and essentially

7    absent some special provision to the contrary in those

8    documents or in corporate law documents means that everybody is

9    entitled to ratable distributions.

10           That's why you see valuation provisions often in

11   closely held corporations so if somebody's going to get out

12   they have to go through a proper means of trying to determine

13   how much their shares are worth at that particular point in

14   time.  And it has nothing to do with the notions that there's

15   been any kind of fraudulent action vis-a-vis the original

16   transaction that gave rise to it.  It's simply the fact that

17   there's an unlawful distribution and you can set it aside.

18   State law is to that effect.  We listed it in our brief.  And

19   it's been held that way for, you know, essentially our whole

20   history.

21           Indeed the whole notion, the dichotomy between equity

22   and debt is essentially premised on this whole notion that

23   equity gets ratable distributions whereas creditors short of

24   being ain a fraud case where the have good faith problems or in

25   a preference period can get preferred.  So that outside the

1  preference period if I have no reason that there's a fraud

2  that's been committed go pester the heck out of my obligee to

3  pay me back and I get paid before the next guy, that's the way

4  the system works and that's because there's a right, there's an

5  obligation due, there's a contractual commitment to repay

6  something, whereas an equity is an interest in, not an

7  obligation owed by.

8          And that's the fundamental distinction and that's

9  been part of our business jurisprudential history for as long

10 as the United States has been here and I believe that comes

11 from principles that go back to common law in England.  It's

12 not challengeable.  And when in fact these issues such as this

13 arise the result is you disgorge the amount that was an

14 unlawful transfer.  And there's a host of litigation about such

15 kinds of matters.

16          So if you then say so what's the difference we go

17 back to our outline, our general outline, what's the difference

18 between this Ponzi scheme -- excuse me, this non Ponzi scheme

19 case -- can you g back to five -- so we've handled that.

20 Outside the Ponzi scheme case is what we just talked about.

21 Hit the next one, please.  So the question is in a conventional

22 Ponzi scheme case in the fraudulent transfer context, is that

23 any different than here.  And what we're going to talk about is

24 the inapplicability of some of the case law that has arisen and

25 why it doesn't apply.  But what we're saying here is is there a

**J&J COURT TRANSCRIBERS, INC.**

30

1  difference between the case that I outline where there's ben no

2  inceptive fraud versus the circumstance which we're presented

3  with in a Ponzi scheme case where there has been.  Okay.

4       And what I want to talk about there is 548(d) as

5  we're going into it.  We're going to return to value and the

6  definition of value says for anon account of an antecedent debt

7  or something that is reasonable equivalent in value.  So the

8  question here is since we know that in a hypothetical case and

9  one that we're going to go over in a second there isn't

10  reasonable equivalence in value how do you get around that and

11  justify that the equity holder in the circumstances where there

12  was inceptive fraud gets to keep unlike the non Ponzi scheme

13  case that we just described that comes out where there has to

14  be a disgorgement.

15       So let's take an initial transaction where there's a

16  hypothetical equity investor investing $500,000 and received

17  500 shares at a thousand dollars per share par value, okay.

18  Now let's go to a redemption transaction.  And we're going to

19  distinguish on the one hand what the investors who are out

20  there in the public think are happening at the time they're

21  getting their money back and compare that to what the actual

22  facts are.  What the investor thinks and what the public thinks

23  at the time is that there was a hundred million dollars of

24  investment.  That's not in the hypothetical, but let's assume

25  that that's the aggregate amount of assets that were put in and

1  that's what investors believe was the amount that had been

2  contributed based upon public reports from the Ponzi scheme

3  entity.

4         The actual facts are that the company is living hand

5  to mouth and essentially the new money is simply paying people

6  who are demanding to get their money back and it's marginally

7  keeping afloat until like the days that led to IMA's demise and

8  <u>Madoff</u> and <u>Stanford</u> and everything else is where the money

9  coming in was to short to keep up with the money that was

10 demanded because there was an increase in need to get money

11 back out through nothing other than macroeconomic forces

12 outside of the Ponzi scheme which led people to make a demand.

13        So in this hypothetical case there are a hundred

14 thousand shares at this par value of a thousand dollars and the

15 actual fact is there are a hundred thousand shares, but the

16 company is only worth -- it shouldn't say par value because

17 it's not the issuance, but it should just say the value of the

18 shares are really now only $10, not a thousand.  Let's assume

19 this $500,000 obviously is what the investor thinks was their

20 equity position and aside from any profit that's what they have

21 in the deal.  The actual value unfortunately is only $5,000,

22 one percent.  And that follows obviously from the fact that in

23 the aggregate everything is only worth one percent of what it

24 was originally worth and the company is basically robbing Peter

25 to pay Paul, getting new money in to pay the -- you know, in a

1  classic Ponzi scheme keeping the matter afloat.

2         Let's assume the party redeems 250 shares at the

3  published 1,000 per share price because they come in and say I

4  need my money and Kirk Wright -- turning to our case -- says

5  okay, well if I don't pay them, you know, this is going to be a

6  deck of cards falling so I'll pay the $250,000, when in fact

7  those shares are worth $2,500.  And we have a classic situation

8  where there is not an exchange for value.

9         So the answer to all of this is well there's an

10 expedient, enter Ebby (phonetic).  And the line of cases that

11 appear to be the salvation which somehow say I'm going to

12 circumvent this problem that clearly there's no reasonable

13 equivalence in value and get around the traditional case that

14 says equity has to be distributed ratably by taking the

15 position that the problem is solved by the fact that I happen

16 to have had a tort claim that arose at the time I got into this

17 deal and it is that tort claim that I'm going to rely upon to

18 say that's what I got my money back for, it's for on account of

19 that antecedent debt not in respect of my equity interest that

20 I got my money.  Cleansed antecedent debt, presto-chango

21 happens and this whole thing works out and there's no problem

22 and the reliance is on the case called Ebby and to so-called

23 seminal case.

24        I got to say that when I started looking at this I

25 went and expected there was going to be this comprehensive

1  analysis in <u>Ebby</u> about how they can get to the point -- getting
2  a little ahead of me here, but -- how they can get to the point
3  of saying that this <u>Ebby</u> case stands for the proposition that
4  they've thoroughly and exhaustively looked at this notion of
5  transmuting a claim from debt to equity or equity to debt and
6  went through an analysis as to how that got justified.  But if
7  you look at the <u>Ebby</u> case -- which interestingly isn't a case
8  about principle, it happens to be a case about profit -- what
9  happened is <u>Ebby</u> got back $4,500 on a $3,000 investment and the
10 trustee in that case was looking to get back the $1,500 as
11 profit.

12         In the context of that -- and now we can go to the
13 section -- and here is the entire paragraph that we're talking
14 about on the right side of the page -- it is not claimed that
15 the payment of 1,500 to Ashley should be returned as a
16 preference for as we've already said at the time it was paid
17 Ashley had no reason to suppose Young to be insolvent.  Okay,
18 forget that because that's really not relevant.  How then
19 should this payment of 15 be disposed of?  At the time it was
20 made Young owed Ashley 3,000 for money actually paid to him
21 which Ashley had a right to recover from him from the moment
22 that he was deceived into paying it.  And then it goes on and
23 says but he can't keep the 1,500.  That sentence at the time it
24 was made owed to Ashley which Ashley had a right to recover
25 from the moment that he was deceived into paying it is the

34

1    logic of supposedly transmutation.

2          There is nothing more in that case about it.  There
3    is no analysis as to why that's fair, right, conforms to state,
4    federal law, bankruptcy principles or anything else, no notion
5    about the fact that it hadn't been articulated by anybody,
6    nothing.  It's just that sentence arising really in a dicta
7    because it was unnecessary.  And in a way it's not surprising
8    that the Ebby court didn't get into this because it was
9    surplusage.  As we point out in our brief this was the first of
10   the classic set of a long line of what we call claim squared
11   cases, situations where the original investment wasn't equity,
12   it was debt, and therefore surplusage to be able to say that by
13   the way they absolutely also had a right of recision or
14   restitution from the moment they were deceived.  And all that
15   is is to say well they had a claim and now they got another
16   version of claim, but it's not to transmute an equity into a
17   debt which is a fundamentally different dog.  Okay, that's
18   Ebby.

19         And if you look -- and I'm not going to belabor it
20   here because the cases are considerable, but the interesting
21   thing about all the cases is they cite Ebby for the proposition
22   that there is a notion of letting the equity holder -- or
23   excuse me -- of letting the investor get back their principle
24   on the basis of having a tort claim period without any
25   discussion.  Not one of the cases examines any of the issues

35

1  presented here today.  Not one of the cases looks at and

2  analyzes any problem of failure of any articulation. None of

3  them examine anything.  They simply cite to <u>Ebby</u> and then cite

4  to the subsequent cases that cited <u>Ebby</u> and I found not one

5  singular bit of analysis of any of that.

6          And as it turns out they all arise in a situation

7  where it's claim squared until a couple cases come up in the

8  late 2007/2008 era.  So not only are they devoid of analysis

9  not dealing with any of the issues here, they're really

10 inapposite because they are claim squared cases so the mere

11 fact that you got a second claim there's no reason to get into

12 a hullabaloo about transmuting something that is inherently

13 equity into debt.

14         So then we enter into looking at what happens at the

15 time of this equity redemption.  And I want to just highlight,

16 there's no articulation of a tort claim b the party who is

17 coming in seeking redemption.  They don't ask for a recision.

18 They don't have any knowledge of the fraud.  And one of the

19 things I'll come back to point out is if they had knowledge of

20 the fraud to be able to mouth hey I got defrauded they'd be out

21 under 548(c) good faith right out of the box.

22         So in essence this convoluted notion of transmuting

23 without any articulation flies directly in the face of the

24 circumstance of 548(c) and is basically an end around that

25 which would be if that were happening in the bankruptcy context

**J&J COURT TRANSCRIBERS, INC.**

36

1   would be precluded.   There's been no lawsuit filed.   There's no

2   due process.   There's no -- actually one of the interesting

3   things is you don't have the defendant entity either:

4   (a)acknowledging that there's been a tort or compromising it

5   based upon a tort.   There's no notice of a claim in an open

6   forum.   And that's one of the important things because our

7   jurisprudential system is predicated on the notion that if Mr.

8   Bates here were to make a claim against IMA and it got into the

9   news or for that matter simply as a matter of public accounting

10  or accounting that has to be done correctly, some audited

11  reports, he got paid a certain amount of money it would reflect

12  in the books and records of the company or in court and other

13  people would understand that and there would be an opportunity

14  to say wait a second, there's a problem here and everybody

15  would be in there and we'd stop the run on the company, stop it

16  hemorrhaging whatever cash it has, stop it from continuing on

17  the Ponzi scheme.

18         But we have none of that because this is all an

19  invention.   It's a legal fiction.   And there's no proof of any

20  of the claim or damages.   Ironically we're here because they

21  want to say was there a Ponzi scheme, but you know without

22  articulation obviously nobody is thinking about saying gee, I

23  have -- here's what happened and Kirk Wright you were guilty of

24  deceiving me and the whole panoply of proof that would be

25  required totally devoid.   And so this is what I call the

1  transmutation without articulation is absurdity or fallacy or

2  whatever you want to and, you know, hit me over the head for

3  being cute about using that term.

4        But I think it -- when I first looked at it this

5  whole transmutation without articulation, whatever you want to

6  characterize, is exactly the nub of the issue.  That is the

7  centerpiece of this problem.  And getting around it is the

8  question because if they can get around that and that could be

9  justified then they have antecedent debt, voila they're

10  satisfied.  If they can't then the issue is -- or then the

11  result is that there is a right to get the money back because

12  they can't satisfy For Value.  So it turns on that.

13        So what I want to do is now come to the nub of the

14  argument which is Section 7, which I guess we don't need to go

15  back to, but it is essentially what's wrong with the

16  transmutation without articulation principle.  And I want to

17  talk about that.  One and two are points we've made already.

18  One is the distinction between debt and equity and the ratable

19  treatment principles applicable to equity that we talked about

20  that are in the embodiment under state law.  Second, it

21  disregards the distinctions in the Bankruptcy Code itself.

22  Claims and interest are obviously vastly different.

23        And, you know, Your Honor has been through this, you

24  know, many, many years and knows that it's pervasive through

25  the Code that there are fundamental differences between the

1  treatment of claims and interest and that interests are always

2  subordinate to the treatment of claims.  And so this runs afoul

3  of it to simply with a flick of a wrist, you know, go back and,

4  you know, in some ledger domain way say well this is just --

5  you know I want it to be this so it's expedient and I'll let it

6  be this because in doing so you're basically adversely

7  affecting the parties who didn't get money back on total

8  contrivance that the other people actually went in and had

9  these claims.

10        All right, so now we get to what I'll call the

11  ignoring the requirements that the claims to be articulated.

12  We went through all of the due process principles.  And I would

13  say also, if you were ever going to in a bankruptcy context

14  make a claim that you wanted to change what you were from a

15  equity to debt you need to use a whole procedure.  It's not

16  even a contested matter unless the parties are going to

17  stipulate to it like we did in a plan.  You need -- if you're

18  going to make that argument you need to bring that as an

19  adversary proceeding, give notice.  Anybody who's got standing

20  under 1109 can come in and be heard.  There's a whole

21  procedure.  Here there's not even an articulation let alone a

22  suit or a claim or a notice.

23        And then finally and what I want to get to here is

24  there are a host of provisions under the Bankruptcy Code that I

25  think are offended by this concept.  And the crafters of the

39

1    Code obviously contemplated in there various provisions we're

2    going to get to a set of principles that ought to be guidance.

3    To strain to find transmutation without articulation to be

4    viable you have to get satisfied somehow that these other

5    principles that inhere in our system of jurisprudence in the

6    bankruptcy area are not meant to constrain this articulation

7    without -- this non articulated transmutation.  And I submit

8    these provisions go very strongly whether this case is in

9    bankruptcy at the time of those payments or not to basically

10   say this casts a serious doubt on whether or not any of that

11   non articulated transmutation can pass muster when you look at

12   it in context of the Bankruptcy Code.

13           And I start first with 510(b) because I think it's

14   the most relevant of these factors.  By the way, I meant to

15   mention as a brief aside the Bayou case in one of its decisions

16   actually held that where you didn't articulate in that case

17   interest that the court said that that -- you can't have

18   transmutation without there being articulation.  You can't say

19   gee, the profit you thought you got -- and this is cited in our

20   papers -- the profit you thought you got you're now going to

21   try to justify as interest on your antecedent fraud claim, you

22   never articulated it and therefore there's no legitimate right

23   for you to try to now characterize it as such.  And that case

24   cite is in our materials.  And that's the closet thing I could

25   find to somebody trying to make that argument in an equity

**J&J COURT TRANSCRIBERS, INC.**

1 context.

2      So 510(b).  We know that this arose as a result of --

3 there was a case decided I think in the Second Circuit right

4 before the 78 Act that basically took this position and said

5 you can't jump up and get something better by transmuting

6 yourself from debt to equity.  When I looked at this clause in

7 the context of this matter I realized that there's more teeth

8 in 510(b) then I ever even imagined when I started studying it

9 because it basically says that unless you've got common stock

10 -- and let's call ourselves that -- you don't even have -- if

11 you transmute from equity to debt you don't even step up to

12 being equal to the creditor that you were trying to get -- the

13 very creditors you were trying to get ahead of.  Indeed you're

14 subordinate to other equity.

15      The only place you're on a parity, meaning he whole

16 exercise is for naught and it gets you nowhere, is if you had

17 common stock before -- call that these limited partnership

18 interests because there are no other levels of equity in these

19 matters -- and then if you prevail you get no higher treatment

20 or different treatment than everybody else who is still equity.

21 So you go say hey, I'm transmuting from creditor status or

22 equity status to claim status by reason of my claim.  And

23 510(b) says well that's all a nice exercise, but it's

24 essentially a worthless exercise.  And unfortunately the result

25 is that this transmutation principle that is without

41

1  articulation is letting the very thing that 510(b) would

2  proscribe to happen.

3           Now, one of the interesting things is let's look at

4  just what would happen if the decision happened quietly and

5  Kirk Wright and the investor had a discussion and signed papers

6  two months before his bankruptcy or the bankruptcy of IMA and

7  said I hereby acknowledge that you have a tort claim in the

8  amount of the original principle because I defrauded you,

9  signed Kirk Wright.  That claim wouldn't be treated any

10 differently when it came time to divi up than the person who

11 held the $1 million stock and is owed $1 million.  They're on

12 equal footing.

13          So the fact that somebody got paid earlier than the

14 bankruptcy shouldn't mean anything different.  Go back and

15 disgorge it.  So 510(b) I think is a pretty compelling reason

16 why in and of itself the transmutation principle that would

17 give rise to a completely opposite result from what 510(b) is

18 intended basically says that can't be used and that the

19 contrivance of the non articulation shouldn't work.

20          Next 548(c).  We talked about this briefly before.

21 You cant collect if you have a belief that something is awry.

22 We know that.  And so the assumption is that when you have this

23 claim you've had to assert it because if you don't have -- you

24 haven't asserted it then why is there a claim.  And so the

25 parties on the defense side here in a sense get caught because

**J&J COURT TRANSCRIBERS, INC.**

they want to say well I had a fraud claim from the inception.
But if they had it to a point where they could have said
anything about it they wouldn't be operated in good faith.

And so in essence this transmutation is an effort to
basically undermine the whole notion of good faith because it's
premised on contrivance of hey I really didn't know to get
around the good faith problem when in fact good faith is part
of the whole notion in the Code and is designed basically as a
means of saying one party ought not to get a head of another in
any unfair way.  If I'm going to let this good faith get
satisfied by the contrivance then I've basically emasculated
and taken out the good requirement under 548 and the
transmutation notion is undermined by allowing this good faith
principle to work.

And finally, we have a series of provisions relating
to the plan in both 1123, which requires that treatment for
claims of a particular class absent agreement are supposed to
be on the same level, and then obviously in 1129 you have you
can't discriminate unfairly which means giving disparate
treatment to people of a same situation.  And what have we
here.  I mean we have a situation where Mr. Bates and I live
next door to one another.  I've got my million dollars back, he
hasn't.  We're both victims of the same fraud on the same day.
I just happened to get my money back, he didn't.  And we're
getting totally dissimilar treatment simply because I got my

1  money back earlier.  And the whole notion is I didn't get it

2  back as equity, I got it back in this contrivance that it was

3  for an antecedent debt.

4      So, Your Honor, the whole thing as you can tell

5  centered on the notion that this transmutation principle ought

6  not work and because it offends principles of common law,

7  principles of debt and equity distinction, principles that say

8  equity must be distributed ratably and a host of bankruptcy

9  principles that I think are offended by any notion of trying to

10 reach t his contrivance in the context of equity.

11     And now finally let me just turn in the last few

12 minutes to the issues that are raised by the last section,

13 eight.  Can you go to eight.  Mr. bates is trying to tell me

14 something.  One second, Your Honor.

15                    (Pause)

16     MR. KAUFMAN:  Mr. Bates reminds me that I have

17 forgotten to mention the recent cases that have arisen that

18 shed light on this and he's most correct and I appreciate that.

19 There have been two recent decisions that have talked about

20 equity and they came up one in 2008, Ninth Circuit decision in

21 AFI, and then preceding that a decision from the Montgomery

22 Alabama Bankruptcy Court Judge Sawyer in the Terry case.

23     Let me deal with AFI first.  AFI is a case in the

24 Ninth Circuit that tried to harmonize two prior cases.  In

25 essence the two prior cases brought up the very concept that

44

we're dealing with here.  One involved a situation where there

was no inceptive fraud, held disgorge the money, unequal

equity.  The other was a case that may have looked like --

though it arose not in an equity case, arose in a situation

where there was inceptive -- yeah, I think did arise in an

equity case and arose in a situation where there was a return

of equity and the court looked at that case and said well this

one holds that you can get your money back.

          And how do we harmonize it.  The court in <u>AFI</u>, if we

go to the relevant language -- go to the sentence above where

it says the trustee argues -- the trustee argues that the

parties did not expressly exchange the restitution claim for

the 89,000 and instead <u>AFI</u> transferred the money on account of

a partnership interest.  That's the -- there it is.  There's

the classic argument that this was in exchange for a

partnership interest.

          The court then says although circumstances of the

exchange were cloaked in terms of a partnership interest just

as ours we delved beyond the form to the substance of the

transaction.  Now their delving -- and I must say without being

indelicate -- isn't much of a delve because I don't know what

they're talking about delving beyond the form to the substance

of the transaction other than coming up with the following

total analysis that gives rise to why that transaction is going

to be allowed notwithstanding the fact that it is a transfer in

J&J COURT TRANSCRIBERS, INC.

1  respective equity.

2         And there's a sentence -- goes forward -- and there's

3  a note above the record demonstrates that Eisenberg was a Ponzi

4  scheme before Mackenzie provided his principle investment thus

5  well before the transfers were made.  Because of this Mackenzie

6  acquired a restitution claim at the time he bought into

7  Eisenberg's Ponzi scheme just as the investors in United Energy

8  acquired -- that's the other case they were distinguishing from

9  this Agri-Tech case which was an equity case where there was no

10  inceptive fraud -- just as the investors in United Energy

11  acquired a restitution claim at the time they bought their

12  solar modules.  It is this restitution claim in toto that

13  Mackenzie exchanged when AFI returned Mackenzie's principle

14  investment amount.  That is the analysis of the Ninth Circuit.

15         There is no discussion of one single argument

16  advanced here today about any problems attendant with silent

17  transmutation, not a one.  No issues of Bankruptcy Code, no

18  analysis of anything, just a conclusion.  And so I would submit

19  that it's a formalistic and artificial basic determination that

20  there's a transmuting of a unarticulated claim for fraud

21  converting an equity investment into something else because the

22  court goes and says I'm going to go beyond the form to the

23  substance of the transaction.

24         I for the life of me don't understand what that

25  means.  I mean if you're going to go to the substance of the

46

1    transaction go to the substance of the issue confronting the

2    Court and that is how do you get -- this justification should

3    have been before the Court -- how do you get this notion that

4    the restitution claim is what was exchanged when that never

5    happened.  That's the substance.  The substance is there was no

6    discussion of any of that.  It's a late after the fact

7    contrivance.

8         And then finally _Terry_ which shed some positive

9    light.  _Terry_ is cited for a couple principles.  First of all,

10   it is a fraud case, but it is not technically in a Ponzi scheme

11   and it involves the return of dividends that are not fair.  And

12   what the court says is all of these cases involve a Ponzi type

13   fraud scheme, but none of them involve the recharacterization

14   of dividends as the repayment of an indebtedness.  That came

15   out in 2007.  What that court was saying is what we're saying

16   here today.

17        At that time and before _AFI_ to the extent its

18   reasoning is even there, there were no courts that talked about

19   the recharacterization, whether it be dividends or profits, the

20   same thing.  No equity like distributions in exchange for the

21   repayment of an indebtedness is what that court holds, and then

22   goes on to say the salient point here is that once the interest

23   held by the recipients is determined to be equity rather than

24   debt any attempt to recharacterize the dividend payment as

25   payment and satisfaction of an antecedent debt fails.  And

1  that's what we have here.

2          And they go on to say if that were the case in almost

3  every corporate bankruptcy case involving fraud shareholders

4  could advance their status and recharacterize their equity

5  interests as unsecured claims, sharing equally in the assets

6  with the holders of unsecured claims.  And that's exactly what

7  510(b) is all about.  So there's the first real case that

8  examines any of the issues along the lines, not all of the

9  issues we examined, but some of the issues that we examined

10  here to justify why this transmutation without articulation

11  cannot work.

12          And then finally we come to asking for partial

13  summary judgment that the For Value matter can't be satisfied.

14  We confront the argument -- by the way, go back to that other

15  case again, that other little highlight, there was one other

16  little quote.  There is no precedent for the proposition that

17  dividends paid to stockholders -- or substitute here, you know,

18  distributions paid to stockholders may be recharacterized as

19  payments in satisfaction fo some kind fo debt.  Also from that

20  Terry decision.

21          So we now confront in the final minutes here and I'll

22  be done the notion that we're told well you can't have it both

23  ways.  You're saying on the one hand you are creditors for

24  purposes of saying that you have an insolvent estate, for

25  purposes of Moore v. Bay, for purposes of Whiteford Plastics

**J&J COURT TRANSCRIBERS, INC.**

48

1   principles -- and we'll come to these in a second -- but on the

2   other hand you're saying you're equity.  How can you be both.

3   And by the way, didn't you already say that we were creditors.

4            And so let's deal with the latter point first, didn't

5   we say they were already creditors.  I don't think you can read

6   the plan and the disclosure statement -- and I won't belabor it

7   long -- and come away with a conclusion anything else other

8   than as open and notorious as we could we distinguished between

9   those tort claimants who had tort claims who were going to be

10  beneficiaries under the plan from those who were tort claimants

11  and are tort claimants as if and when they pay their money

12  back, but who are not entitled to tort claimant status until

13  their claim is allowed who are going to be sued because they

14  haven't given back the money and haven't otherwise settled.

15           The plan is explicit about all that and I need only

16  look at section 3 of the plan, 3-10, which says the

17  post-confirmation debtor acting through the plan trustee shall

18  be authorized to pursue and manage and resolve bankruptcy

19  claims against holders  of investor tort claims as set forth in

20  Article 5. So that takes you right to Section 5.  Section 5(c)

21  says the plan trustee shall object to the claims of the holders

22  of investors who are less than their high water mark.

23           Now we didn't do it to everyone, Your Honor.  There

24  was some -- and I think this was all disclosed in the plan

25  itself -- there were some people who got such a de minimis

**J&J COURT TRANSCRIBERS, INC.**

1    amount back that it made no sense to be pursuing them.  So

2    there was some flexibility afforded so that we weren't wasting

3    dollars and cents and husbanding more rationally the cash of

4    the estate.  -- who got less than their tort claims who are

5    less than their high water mark and can institute adversary

6    proceedings.  And then those who are listed are expressly told

7    that they're listed and they're not going to receive -- and

8    this is consistent with 502(c) -- they receive no distribution

9    until their claims are resolved.  In other words, they don't

10   have a claim as such.  Even if somebody had for example, Your

11   Honor, invested a hundred thousand dollars, gotten 50,000 back,

12   and let's assume that was over the threshold.  So as to the

13   50,000 they're not entitled to receive any distribution until

14   they resolve the fact that they got $50,000 back.  And so while

15   they are a claimant for $50,000 potentially that isn't going to

16   get resolved their status as a defendant as to the 50 they

17   already got back is resolved.  The plan is explicit abut it.

18   And then there are three or four pages, not a paragraph or two,

19   in the disclosure statement that discussed the whole issue and

20   discussed the fact that there is going to be -- that there was

21   a Ponzi scheme and how all of this worked and it lays out in

22   explicit detail, for example, if the recovering investors can

23   establish good faith they maybe able to establish that they

24   provided value.  Under the terms of the debtor's investment

25   agreements the debtor's investors held equity interest in the

50

1  debtor's investment funds.  And then it says focusing

2  specifically on the For Value prong, recovering investors

3  because they made their investments in the debtor's of equity

4  holders may not be able to satisfy that prong of 548.  And we

5  go on and then describe what the problem is and its -- they're

6  seeking it based upon this transmutation principle and that

7  we're going to proceed with it.

8         Everybody is on notice that this is going to happen.

9  There is no -- it's disingenuous I think to make that argument.

10  That said, if we turn from whether or not it's open and

11  notorious and there's no res judicata effect -- and the

12  distinction is that everybody is a tort claimant as defined

13  under the plan.  Some tort claimants have an obligation owing

14  and they can't get any recoveries and that's the distinction.

15         Now, as to having tort claims the idea of the plan

16  was that everybody who has a tort claim as and when allowed has

17  a claim that relates back in time.  Nobody is disputing that

18  they don't have a claim that arose at the time they first made

19  their investment.  That's not disputed.  Therefore, there isn't

20  an issue of whether or not once now blessed by the bankruptcy

21  plan or if it otherwise required an adversary proceeding I

22  suppose blessed by the adversary proceeding you have a now for

23  then determination that the claim existed and the treatment now

24  for then is what the plan is all about.  The fact that these

25  people have claims that relate back give them creditor status

51

1  once that claim is established as such.  That's what this

2  bankruptcy was about, establishing that as the case.  We're

3  just not blessing those who got money back until and unless

4  they put money back in the coffers correctly and then they too

5  will have tort claims.  There's no dichotomy that catches us on

6  the shoals.  There are creditor claims, lots of them, of people

7  who got not one set back who under the plan now have claims,

8  those claims relate back in time and under <u>Moore v. Bay</u> anybody

9  who got distributions from and after any extant person who is a

10  tort claimant with an allowed claim gives rise to that person

11  being able to assert on behalf of everybody under <u>Moore v. Bay</u>

12  the rights to avoid.  That part's unassailable.

13          The issue that I think is presented by the defendants

14  here is, well, there are no creditors.  Our view of the matter

15  is clearly they are.  The only problem is, transmuting when

16  they did it.  There's no question that they had a claim.

17  That's why they're called investment -- investor tort

18  claimants.  We acknowledge that the problem is transmutation

19  and payment back then, not whether they had a claim.

20          And, so that same principle not only applies to <u>Moore</u>

21  <u>V. Bay</u>, it also says the estate's insolvent because all those

22  creditor claims are treated as such and it also solves

23  <u>Whiteford</u> which stands for the proposition that you can't give

24  -- can't make an avoidance claim for the benefit of equity.

25  Since all these people are essentially creditors, not equity,

52

1   that's the case.  And there's also a finding in the <u>Bayou</u>

2   decision that stands for the proposition that in the context of

3   circumstances where you don't have an insider benefitting, but

4   have a circumstances where all the parties who are adversely

5   affected, even if you're going to call them equity, are really

6   innocence, that the <u>Whiteford</u> principle which was designed to

7   say you don't avoid for the benefit of insiders, isn't this

8   case here.  These are essentially outsiders who were duped and

9   we'll treat it as such and won't make <u>Whiteford</u> apply even if

10  you don't treat them as creditors.

11          But, for all the reasons we've stated, in our view,

12  these folks were creditors.  They relate back in time.  The

13  issue is transmutation, not whether they had a claim, but how

14  it was treated.  That's the nub of the case.  It's the nub of

15  any defense and with that, Your Honor, I'm complete and I

16  appreciate the Court's indulgence and that of my adversaries,

17  as well, and anybody else who I imposed on.

18          THE COURT:  Thank you.  Mr. Mungovan, are you next?

19          MR. MUNGOVAN:  I am next, Your Honor.  Just so I can

20  pace myself I think that you said you'd go to your luncheon at

21  -- is it quarter of 12?

22          THE COURT:  Yes.

23          MR. MUNGOVAN:  Thank, Your Honor.

24          THE COURT:  I'll probably leave -- I'll probably

25  leave the -- we'll probably need to break by 11:40.

53

1          MR. MUNGOVAN:  Okay.  If I'm not done with my

2    argument, can I continue?

3          THE COURT:  If you're not done, we'll come back and

4    hear it when you're done.

5          MR. MUNGOVAN:  Thanks so much, Your Honor.

6          THE COURT:  When I'm done, excuse me.

7          MR. MUNGOVAN:  On behalf of the Joint Defense Group

8    which is identified in the memorandum that was submitted by the

9    various parties, I want to thank Your Honor for hearing us

10   today.

11         Let me start by trying to summarize the last hour and

12   twenty minutes or so into the trustee's argument, in a few

13   sentences, okay?  I think the trustee's argument is actually

14   fairly straight forward.  He's essentially saying that the

15   defrauded investors here, these individuals, did not give value

16   under 548(c), okay?  His argument is that their investments

17   that they made when they subscribed into the fund were in the

18   nature of equity, not debt.  So, he creates this very bright

19   distinction between equity and debt.

20         He's arguing -- the trustee is arguing that the Court

21   should decline to follow what has been the consensus view on

22   how to handle these types of transfers to defrauded investors.

23   And what he's essentially saying is that in a Ponzi scheme

24   context you should treat investors as equity and not, as he

25   articulates this transmutation theory, as somehow having been

**J&J COURT TRANSCRIBERS, INC.**

54

1    converted into debt holders.

2          The rationale for distinguishing this case -- the IMA

3    case, Your Honor, from a long line of cases that we'll go

4    through in more detail is essentially two manufactured

5    rhetorical theories that the trustee has come up with.  And one

6    of those is the transmutation without articulation theory, and

7    the other is what he calls the claims squared analysis.  And I

8    would suggest to you that when we go through the case law, both

9    of those manufactured, distinguishing features fall apart upon

10   any analysis of the cases.

11         What we think the right way to go here, Your Honor,

12   is the consensus view of all of the cases that have analyzed

13   this type of Ponzi scheme and these types of transfers to

14   defrauded investors.  What those cases tell us, what they teach

15   is, that the equity versus debt distinction that the trustee

16   wants to highlight is irrelevant.  The courts don't even look

17   at it.  They don't analyze it, at all.  What the courts focus

18   on is the claims that arose at the time that the investment was

19   made.  Okay?  The key in this case and the key in all of those

20   other cases is that this was a Ponzi scheme.

21         The trustee asserts that as a Ponzi scheme it was a

22   fraud from the beginning.  That's in the trustee's undisputed

23   statement of material facts; fraud from the beginning.  What

24   that means then is, that when each one of these investors

25   represented by each of these lawyers out here invested, they

1   lost money at the moment they invested.  We haven't heard the

2   trustee's counsel talk about that, at all.  He doesn't want to

3   focus on that.

4        What he wants to focus on is the time that the

5   transfers took place out from the fund to the investors.

6   Again, that's not the focus of what the courts are looking at.

7   The consensus view is, the first place to look is what happened

8   at the time the investment was made and that key fact is going

9   to be the distinguishing feature in several of these cases that

10  we'll get into.

11       The next key feature is that the trustee admits --

12  after admitting that there was a fraud ab initio, the trustee

13  admits in his papers that each of these defrauded investors had

14  a claim that arose at the time of their investment.  That's the

15  loss.  So, whether you call it a claim for recission, whether

16  you call it a claim for fraud, a claim arose at the time the

17  investment was made.  And the trustee makes those admissions on

18  Page 8 of his opening brief and Page 6 of his reply brief.

19       The reason that that admission is important, Your

20  Honor, is because under the definitions of the code a claim for

21  recission constitutes value at the time that the payment -- the

22  transfer was made from the fund out to the investor.  There is

23  an exchange -- a dollar-for-dollar exchange is how all of the

24  consensus cases look at it, a dollar-for-dollar exchange

25  between the redemption payment and the recission claim.

**J&J COURT TRANSCRIBERS, INC.**

56

1          If you look at, Your Honor -- I'm going to highlight

2     a couple of cases here which were cited in both parties'

3     briefs.  The first case is the <u>United Energy Corp.</u> case which

4     Mr. Kaufman referenced.  It's the Ninth Circuit Court of

5     Appeals from 1991.  And what the Court says here is on Page

6     595, value is defined for the purposes of Section 548 of the

7     code as "property", or satisfaction or securing of a present or

8     antecedent debt of the debtor.  We went through that already.

9     The term "antecedent debt" is not defined in the code.  Debt,

10    however, is defined in the general definition section of the

11    code as "liability on a claim".

12          And then the Court goes through to define "claim" and

13    it highlights the defined term in the United States Code for

14    Claim.  And what the Court then says is, "The legislative

15    history of the Code evidences Congress' desire to provide an

16    expansive definition of claim under Section 101, Subsection

17    (4).  Thus, it is plain that Congress intended debt and

18    therefore antecedent debt to be construed broadly."

19          And then what the Court does is it goes on to explain

20    that there's this dollar-for-dollar exchange between the claim,

21    the recission claim and the transfer of monies out of the Ponzi

22    scheme, meaning that the investor gave value.  And that, Your

23    Honor, is a summary of our entire position in this case.  Our

24    clients -- the joint defense clients and, indeed, every

25    investor in this case that the trustee has brought an avoidance

**J&J COURT TRANSCRIBERS, INC.**

1  action against has given value at the time that they made or

2  accepted the transfer of monies out of IMA to themselves by

3  giving up a dollar-for-dollar claim for recission based on

4  their fraud claim at the time that they invested.

5           So, let me focus back in on the trustee's position.

6  It's our contention, Your Honor, that the trustee is focusing

7  on the wrong thing.  He focuses on the nature of the investment

8  asserting that the nature of the investment when made, being

9  "equity" in his definition, is the controlling feature and is

10  the controlling aspect of this entire analysis.  Instead, what

11  the consensus cases say is, the controlling feature is the

12  fraud that existed at the time that the investment was made.

13          Now, the trustee attacks the consensus -- the

14  consensus of cases in three ways and they're all tied to this

15  notion of an equity investment at the time of making the

16  investment.  First, we're going to start with <u>Ebby</u> because

17  that's where the trustee starts.  If he continues to assert

18  that the nature of the initial investment in that case wasn't a

19  "equity investment" -- excuse me, a debt investment, a debt

20  investment, the trustee tries to distinguish <u>Ebby</u> by saying the

21  investors in that case made an investment as a debt.  It's not

22  equity.

23          Your Honor, if you look at the case and I'm going to

24  bring it out and read you some of the pieces of the case, it's

25  just not supported by the plain language in the case, itself.

**J&J COURT TRANSCRIBERS, INC.**

1   In fact, as you read Ebby it is eerily like the IMA case except

2   that Ebby was written in 1924.

3            This is a description of the facts, Your Honor, right

4   from the case, Circuit Judge Woods, Circuit Court of Appeals,

5   Fourth Circuit.  Young, beginning probably in the early part of

6   1919 and continuing until bankruptcy in October 1922, Young

7   conducted in Baltimore a blind pool.  Today we might call a

8   blind pool a hedge fund.  He induced customers to pay to him

9   for this enterprise various sums of money.  For each payment he

10  issued a receipt providing that the amount was to be placed to

11  the credit of the customer in an account opened and managed by

12  me for the -- I'm going to quote here -- was to be placed to

13  the credit of the customer, "in an account opened and managed

14  by me for the purpose of buying and selling any securities

15  traded in on the New York Stock Exchange."

16           So, what were they doing?  They were making an

17  investment into a pool to allow the manager, this individual,

18  Young, to buy and sell securities on the New York Stock

19  Exchange.  It sounds a lot like our case.  The Court goes on to

20  note that the customer was to have the right, "to withdraw all

21  or any part of his account upon 30 days written notice to be

22  given on the first day of a calendar month."

23           Your Honor, if you look at the subscription documents

24  that are attached to my brother's papers you'll see many of the

25  same features, that it was a blind pool where the manager, Kirk

59

 1  Wright (phonetic), and his entity was allowed to invest in all

 2  manner and any manner of assets.  There was a right to withdraw

 3  your capital account on 30 days written notice.  There was a

 4  sharing of the profits.  In other words, the manager, Kirk

 5  Wright, like the manager in the <u>Ebby</u> case, got a large share of

 6  the profits.  The manager in the <u>Ebby</u> case, I believe, got 30

 7  percent of the profits, so he was a little bit higher than Mr.

 8  Wright.

 9        What my brother showed you up on the board, Your

10  Honor, in an effort to demonstrate that this is a debt case and

11  not an equity case was a quote, and I'll read it to you again.

12  The quote is, "At the time that it was made," referring to the

13  payment, "Young owed Ashley $3,000 for money actually paid to

14  him which Ashley had a right to recover from him from the

15  moment that he was deceived into paying it."  I want to

16  highlight that word "deceived", Your Honor.  I'm going to read

17  it again.  "Ashley had a right to recover form him from the

18  moment that he was deceived into paying it."

19        Now, when I heard my brother talk about that

20  particular caption, what I heard him trying to say is that that

21  sentence suggests that this is a debt case.  But, this

22  sentence, to me, suggests something entirely different.  What

23  this sentence suggests to me, and if you read the case that

24  immediately follows it, <u>Clark Trustee v. Rogers</u>, which I did

25  this morning, you'll realize that what the Court is talking

**J&J COURT TRANSCRIBERS, INC.**

60

1  about there is that a claim for recission has arisen for fraud

2  at the time that the investment was made.  This is not a note

3  case.  This is not a situation where the investor gave -- or

4  received a note in exchange for giving money to the fraudster.

5  This is just like our case.

6          And what the Court is saying here, for maybe the

7  first time, is that upon the making of the investment where

8  there is a fraud, a claim for recission arises at that moment.

9  And what the case also says is that as a result of that claim

10 for recission arising, when the investor receives back

11 principal there is a dollar-for-dollar exchange on the

12 recission claim, meaning that the investor gave value.  So, I

13 would suggest, summing up the Ebby case, that the trustee

14 misreads the Ebby decision.

15         The second thing that the trustee does -- so, aside

16 from this excessive focus on equity -- the equity investment up

17 front and misreading the Ebby case, the second thing that the

18 trustee does is he's come up with what he calls or constructs

19 the claims squared concept, which in plain English means that

20 there's alternative theories of the decision.  That's all the

21 plain -- that's all that I believe claims squared means as I

22 read my brother's brief.

23         What's a fiction though is this idea of the

24 alternative theory of recovery.  This claims squared analysis,

25 "the alternative theory of recovery", is premised upon the idea

**J&J COURT TRANSCRIBERS, INC.**

1  that <u>Ebby</u> is a debt case when, in fact, we know now having read

2  it that <u>Ebby</u>'s not a debt case.  <u>Ebby</u> is -- if it's an equity

3  case, it doesn't matter.  It's just like our case.  Okay?  But,

4  the Court doesn't care equity versus debt.  What the Court

5  focused on was the fraud that existed at the time of the

6  investment.

7       So, the claims squared analysis, the alternative

8  theory analysis, is a pure fiction created by the trustee in

9  order to create controversy around and distinguish the

10 consensus cases from our case when, in fact, an analysis of

11 these cases shows that these cases, the consensus cases, even

12 the cases that the trustee cites, are on all fours with our

13 case.

14      What the trustee then does is, he applies what he

15 calls his claims squared analysis -- and I'm going to walk

16 through some of these cases, to -- we'll go through the first

17 case, the <u>Independent Clearing House</u> case.  And the <u>Independent</u>

18 <u>Clearing House</u> case is from the Unites States District Court

19 for the District of Utah from 1987.

20      THE COURT:  That case gets a little more weight than

21 other cases because there was three judges who decided it.

22 It's an en banc decision.  I don't know if you all noticed

23 that.  Go ahead.

24      MR. MUNGOVAN:  So, in --

25      THE COURT:  There was more than one judge is the

1    point that came to that conclusion.

2              MR. MUNGOVAN:  I understand.

3              THE COURT:  Although they were all in the same

4    district, maybe they were infected by one another.

5              MR. MUNGOVAN:  That has a tendency to happen

6    sometimes.

7              THE COURT:  So, go ahead.

8              MR. MUNGOVAN:  The key -- there's several key points

9    in this case, Your Honor.  And, of course, you can read it on

10   your own, but I want to highlight a couple of the key points.

11             First and foremost, what the Court says -- and I'm

12   going to quote right from the case, "The trustee argues on

13   appeal that each contract between a defendant and a debtor did

14   not create a debt on the part of the debtor, but rather gave

15   the defendant an ownership interest in the debtor's business."

16   Sounds a little bit like what the Court is saying here is what

17   the trustee in this case is arguing the same thing -- this is

18   the Independent Clearing House case -- is arguing the same

19   thing that our trustee here is arguing.

20             These individuals who received these transfers were

21   actually equity investors.  Okay?  What the Court says though

22   is we conclude that the debtors received, "reasonably

23   equivalent value in exchange for all transfers to a defendant

24   that did not exceed the defendant's principal undertaking, but

25   to the extent a defendant received more than he gave the

63

1  debtors, the defendants did not receive a reasonably equivalent

2  value."

3          Then the Court goes on to explain its analysis or its

4  conclusion.  So, what they're saying is, up to the amount that

5  you invested you gave reasonably equivalent value because this

6  is a Ponzi scheme.  What the Court says is from the time a

7  defendant entrusted his money to the debtors, he had a claim

8  against the debtors for the return of his money.  We believe

9  that the Code's definition of debt and its related terms is

10 broad enough to cover the debtor's obligation to return a

11 defendant's principal undertaking whether that obligation was

12 based on the contract between the debtors and the defendant or

13 was based on the defendant's right to restitution.

14         So, what the Court's saying here is, not that this is

15 claims squared, what the Court is saying is, look at the time

16 the investment was made.  There was a fraud.  Okay?  And so

17 there's reasonably equivalent value that is given as a result

18 of the fraud based on either the contract or on a recission

19 claim.  The Court's not saying here, importantly, this is a

20 debt case and therefore the investor gave reasonably equivalent

21 value.  That's not what the Court's saying, at all.

22         The Court then says, "Thus to the extent the debtors'

23 payments to a defendant merely repaid his principal

24 undertaking, the payment satisfied an antecedent debt of the

25 debtors and the debtors received value in exchange for the

1    transfers.  Moreover, to the extent the transfer merely repaid

2    a defendant's undertaking, the debtor received not only a

3    reasonably equivalent value, but the exact same value

4    dollar-for-dollar.  We, therefore, hold that such transfers are

5    not avoidable under Section 548(a)."  That's our case, Your

6    Honor.

7            Next point.  The Court says, "The trustee has not

8    argued that the contract between each defendant and the debtors

9    was illegal or otherwise unenforceable on its face.  Courts'

10   refusals to enforce an illegal bargain generally rest on the

11   elementary principle that one who has himself participated in a

12   violation of law cannot be permitted to assert in a court of

13   justice any right founded upon or growing out of the illegal

14   transaction."  That's not our case either, Your Honor.

15           Last point on this case.  The Court says under

16   Section 548(c), so we were under 548(a), the section that I was

17   just reading to you, now, we're under 548(c).  The extent to

18   which a defendant gave value for a particular transfer is

19   essentially the flip side of the question we have already

20   discuss under Section 548(a)(2), namely whether the debtor

21   received a, "reasonably equivalent value in exchange for the

22   transfer."  For the reasons previously stated, we conclude that

23   what the defendants gave the debtors in exchange for such

24   transfers was not value -- excuse me -- that's the profit

25   section.  I apologize, Your Honor.

65

```
 1              Next section.  We have also concluded that to the
 2   extent transfers to a defendant did not exceed the amount of
 3   the defendant's undertaking, the debtor received a reasonably
 4   equivalent value for the transfer.  The converse is also true.
 5   To the extent that a defendant received amounts less than or
 6   equal to his undertaking, he gave value to the debtor in
 7   exchange for the transfers.  This case, Your Honor, is on all
 8   fours with our case.
 9              I see that it's time to break.  I'd like to continue
10   my argument after lunch.
11              THE COURT:  Yes, which we will do.
12              MR. MUNGOVAN:  Thank you, Your Honor.
13              THE COURT:  Thank you.  This would be a good time to
14   break, so why don't we come back -- well, let's just say about
15   an hour, at 12:45, okay?
16              MR. MUNGOVAN:  Thank you, Your Honor.
17              THE COURT:  Thank you all, very much.
18                          (Recess)
19              COURT CLERK:  We're back on the record in the IMA
20   case.
21              THE COURT:  Go ahead.
22              MR. MUNGOVAN:  Good afternoon, Your Honor.  Thank
23   you.
24              Let me just recap where we were, Your Honor.  The
25   trustee is attacking the consensus view of how to handle
```

**J&J COURT TRANSCRIBERS, INC.**

1    distributions to defrauded investors in three ways.  He attacks

2    the Ebby case, which we've explained that attack is without

3    basis in the case.  The trustee has then created these two

4    constructs, and I'm going to use a word that the trustee's

5    counsel used in his argument, and that is a fiction.  The word

6    is a fiction.  Those two constructs, Your Honor, one being

7    claims squared and the other being transmutation without

8    articulation.  They are a fiction.  They do not exist in the

9    case law.

10            I've pointed out what claims squared means I believe

11    in my interpretation of the case law.  It essentially is this

12    alternative theory of rendering a decision by the Court.  And

13    as I walk you through a couple of more cases I'll emphasize why

14    the claims squared theory actually lacks any basis in fact.

15            This transmutation without articulation is, it's a

16    figment of imagination.  It doesn't exist.  Not only does it

17    not exist in express terms in any of the cases, it doesn't even

18    -- there's no basis for the concept in the cases themselves.

19    Let me explain why.

20            In the M&L Business Machines case which the trustee

21    cites in both of their briefs, and that case does happen to

22    involve an instance where the initial investment appears to be

23    in the nature of a promissory note, a debt, as trustee's

24    counsel would refer to it.  And what the Court goes through to

25    decide, in great detail, is that there is a claim for recission

**J&J COURT TRANSCRIBERS, INC.**

67

1  based on a Ponzi scheme that existed at the time of the

2  investment.  And what the Court focuses on again is not the

3  nature of the investment that was made by the defrauded

4  investor/defendant.  What the Court focuses on is the nature of

5  the fraud that took place and the claim that the investor

6  obtained at the time that the fraud occurred, i.e., when the

7  investment took place.  And the Court goes through, in great

8  detail, and explains why the investor has a claim for recission

9  and why the investor gave value when it exchanged that claim

10 for recission upon receiving transfers of principle when it

11 exited the investment.

12         What the Court says -- and this is -- I'm going to

13 read this.  I'm going to quote it because it's a Tenth Circuit

14 case from 1996 and it says, "One who has been fraudulently

15 induced to enter into a contract may rescind the contract and

16 recover the benefits that he has conferred on the party who has

17 defrauded him."  In this case the evidence in the record

18 indicates that Mr. McKay, the investor, was fraudulently

19 induced to invest in M&L.  As a result in light of the

20 bankruptcy court's factual finding that he did not have actual

21 knowledge of the fraud, Mr. McKay has a colorable claim to

22 recover the amounts that he invested in M&L.  The bankruptcy

23 and district courts thus properly concluded that M&L's payments

24 to Mr. McKay reduced the amount of this restitution claim that

25 M&L thereby received reasonably equivalent value for its

68

1  payments to him and that the trustee was not entitled to avoid

2  the transfers under 548(a).

3          What the trustee wants to say, what he says in his

4  reply brief is, "While the M&L Court may have reasoned that the

5  passive retroactive recognition of previously unasserted fraud

6  claims can support the value analysis and the claims squared

7  context, the Court never explored whether unasserted fraud

8  claims can be the basis for the re-characterization of a

9  transfer made in respect to what was originally an equity

10 investment as having been made in respect to the payment of a

11 fraud based debt claim."

12         Let me try to translate that.  What I think the

13 trustee is saying here, Your Honor, is that in the M&L Court --

14 in the M&L case -- the M&L case really doesn't apply here --

15 now, I'm acting as the trustee's counsel -- the M&L case

16 doesn't apply here, Your Honor, because the M&L case did not

17 involve an analysis of this recission claim in the context of

18 an equity investment.  M&L is a debt case, Your Honor, based on

19 the plain language of the first paragraph where the initial

20 investment was a note.

21         Your Honor, with all due respect, that's nonsense.

22 When you read the case itself what the Court is focused on in

23 M&L is not the nature of the investment.  The Court is focused

24 on the fraud and the claim that arises as a result of the

25 fraud.  So, let's put the M&L case aside because we do, in

69

1  fact, have a case where a court does, in fact, address the

2  recission claim in the context of what the trustee's counsel

3  would call an equity investment and that case, Your Honor, is

4  the AFI case.

5       And the AFI case -- if you just bear with me a minute

6  as I turn to it -- the AFI case trustee's counsel referenced in

7  his PowerPoint, Your Honor.  It's a Ninth Circuit case from

8  2008, and in that case we did have a limited partnership.  We

9  had a limited partnership.  So, under trustee counsel's

10 interpretation of the analysis, the proper analysis, the

11 transmutation without articulation analysis, we have a limited

12 partnership which means that this case, the AFI case, is,

13 according to the analysis of trustee's counsel, just like our

14 case because we have limited partnerships here, too.

15       But, there's something very interesting that happens

16 in this case, Your Honor.  The Court says, "The limited

17 partners in the case at bar were defrauded into their limited

18 partnership role by the operator of the Ponzi scheme creating

19 rights different than the rights held by the limited partners

20 in Agri-Tech.  The trustee's argument that Agri-Tech should

21 control because both cases involved limited partnerships --

22 limited partners," excuse me, "overly simplifies the cases and

23 is not persuasive."

24       So, what does the Court go on to do?  The Court goes

25 on to say, as noted above, the record demonstrates that

**J&J COURT TRANSCRIBERS, INC.**

1    Eisenberg's operation was a Ponzi scheme before Mackenzie

2    provided his principal investment and thus, well before the

3    transfers were made from AFI to Mackenzie.  Because of this,

4    Mackenzie acquired a restitution claim at the time he bought

5    into Eisenberg's Ponzi scheme, just as the investors in United

6    Energy, which we previously addressed, acquired a restitution

7    claim at the time they bought their solar modules.

8            There's more that the Court says here, but the point,

9    Your Honor, is that we have here the construct that trustee's

10   counsel claims doesn't exist.  We have a situation where the

11   Ninth Circuit Court of Appeals takes a Ponzi scheme which is a

12   limited partnership, which counsel would call an equity

13   investment, and doesn't even address this issue of equity

14   investment versus debt.  What they look at is the nature of the

15   fraud and the time that the claim as a result of the fraud

16   arose.  And the time that the claim as a result of the fraud

17   arose was at the time the investment was made, as in this case,

18   because remember the trustee has asserted that the fraud

19   started at the beginning before any one of these investors or

20   clients of these counsel here invested in IMA.

21           Counsel then refers to the Bayou case, Your Honor.

22   Of course, the Bayou case doesn't have -- the holding of that

23   case doesn't have any direct application to this case, Your

24   Honor, because the Bayou case involved prejudgment interest and

25   it involved a claim for profits.  What we do know from the

1    Bayou case that does have application to this case is the

2    Court's reference to this value issue.

3          Keeping in mind that this decision that trustee's

4    counsel has attached is a decision on a motion to dismiss.  As

5    background what the Court says is, "It is also clear under the

6    case law, as defendants assert, that persons who are induced by

7    fraud to invest in the Bayou hedge funds or predecessor funds

8    may have a state law claim for recission and that this tort

9    claim in an antecedent debt which constitutes value for

10   purposes of Section 548(a)(1)(b) and Section 548(c).

11         "Plaintiffs," -- which is the trustee in this case,

12   "acknowledge that defendant's tort claims for recission of the

13   entire amount of their principle invested constitute value for

14   purposes of Section 548(a)(1)(b).  Consequently, plaintiff's

15   constructive fraud claims under Section 548(a)(1)(b) are

16   limited to any fictitious profits which were paid to any of the

17   defendants."

18         So, the only application that Bayou has to our case

19   because we've already limited -- we've agreed to limit the

20   discussion here today to value under 548(c).  What Bayou stands

21   for on that narrow issue is that investors have a claim for

22   recission that constitutes value that arises at the time that

23   they made their investment into the fraudulent Ponzi scheme,

24   exactly as here.

25         The next point that I'd like to raise, Your Honor, is

**J&J COURT TRANSCRIBERS, INC.**

72

1 this -- the second half of the transmutation without

2 articulation argument -- the without articulation argument.

3 And what the trustee -- I can summarize it in the trustee's

4 reply brief.  The trustee says, "The cases cited by respondents

5 actually make the trustee's point that a fraudulently induced

6 party seeking redress has the right to take affirmative action

7 to remedy his injury by either affirming or rescinding the

8 contract and suing for damages."  And then the trustee cites to

9 a Georgia appellate court case.

10       The trustee then says, "The defrauded investors

11 herein never took any such affirmative action to assert or

12 articulate any fraud claims."  Well, that would be kind of

13 tough, wouldn't it?  Because even the trustee knows that if

14 they were aware of the fraud at the time that they made their

15 redemption, then they wouldn't be able to establish good faith.

16 And we know, Your Honor, that at least in some of the instances

17 where we have investors, for example, Mr. Laird who redeemed

18 only a fraction of his overall investment, we know that he must

19 not have known of the fraud, Your Honor, because logically if

20 he was aware of the fraud why would he have left behind more

21 than a million dollars?  He wouldn't have.  He would have taken

22 it all out.

23       And so this idea that the trustee is suggesting that

24 there was some duty among these investors who had no knowledge

25 of the fraud to articulate a claim for fraud at the time that

**J&J COURT TRANSCRIBERS, INC.**

1  they were making a withdrawal, again, without trying to sound

2  pejorative, it -- it's nonsense.  It defies logic.  It couldn't

3  happen.  And so this -- again, this idea of a transmutation

4  without articulation fails upon any reasonable examination of

5  what it's premised upon.

6        The next argument.  The trustee cites to the <u>Terry</u>

7  case, and it was one of the last cases that the trustee

8  referenced.  We address the <u>Terry</u> case in our brief.  We're

9  going to stand on it as stated in our brief, but I want to

10  highlight probably the critical distinction between the <u>Terry</u>

11  case and this case.

12        The <u>Terry</u> case was not a Ponzi scheme.  It was an

13  action to recover payments in the form of dividends to

14  shareholders.  There was no corresponding claim of fraud that

15  arose at the time that the recipients of the dividends made

16  their initial investment into the fund.  So, <u>Terry</u> has no

17  application to this line of consensus cases on how to handle a

18  Ponzi scheme.  It's not a Ponzi scheme case.

19        Let me summarize in a few minutes here, Your Honor,

20  what's really happening.  The trustee is essentially trying to

21  change the law and the trustee can make arguments to change the

22  law.  That's certainly permitted under our rules of ethical

23  conduct.  It's, in fact, how the laws developed, but he's doing

24  it in a way that suggests that these individual defrauded

25  investors are the ones who are trying to change the law.  We

74

1    should just face up to the fact -- the trustee should face up

2    to the fact that he's looking to change the law.  And what I'm

3    suggesting to the Court is the basis on which the trustee is

4    seeking to change the law has no foundation in the

5    jurisprudence and is fundamentally illogical based on all of

6    the cases that have looked at this.

7        And what the trustee's counsel wants to say is, these

8    cases, these consensus decision, as we call them, don't really

9    apply because these courts, they didn't look at the

10   transmutation without articulation theory.  They just didn't

11   address it.  But, the reason that they didn't address it, Your

12   Honor, is because it doesn't exist and this Court should not

13   bring it into existence and here's why.

14       There's not a single -- there's not a single case

15   that is published that addresses and treats claimants the way

16   that the trustee seeks to treat them.  There's not a single

17   case that I'm aware of in the country, Your Honor, involving a

18   Ponzi scheme of a hedge fund where the trustee has successfully

19   been able to reclaim principal from investors, from defrauded

20   investors, where those investors acted in good faith.  And

21   we're not getting into good faith.  And I know in Bayou that

22   the trustee did clawback principal from investors, but those

23   investors and that case did not have good faith.

24       I've spoken with the trustee, Jeff Marwill

25   (phonetic), in the Bayou case.  And this isn't evidence, but I

1  can tell Your Honor that if you look through the record in

2  <u>Bayou</u> there are many investors that the <u>Bayou</u> trustee did not

3  go after where they redeemed less than 100 percent of their

4  investment.  And that's because that's evidence that they acted

5  in good faith.

6        If this Court adopts the proposal to change the law

7  that the trustee is suggesting it should, it will wreak havoc

8  in every Ponzi scheme case that happens hereafter where a

9  trustee will seek to clawback principal from innocent defrauded

10 investors.  And we will have a series of cases, like this one,

11 where the recovery that has been obtained so far is less than,

12 or equal to or barely above the amount of the legal fees.

13       Now, I don't know where we are on the legal fees in

14 this case, Your Honor, relative to the recovery, but the last

15 time I checked we were pretty close to par.  And if we have a

16 situation where in every case a trustee goes after redeeming

17 investors who were themselves defrauded and who still have a

18 claim for money, like the Lairds and like many of the other

19 investors, we will have litigation that goes on forever.  We

20 will have a litigation mill, a bankruptcy mill.

21       That's why, Your Honor, in Madoff, I suggest to you

22 if you look at the record in Madoff, the trustee in that case

23 has chosen not to go after investors for their principal,

24 unless they were in some way connected to the Madoff fraud or

25 the family.  It's why I would suggest to you, Your Honor, that

76

1    the SEC in the Stanford case, which is a matter of public

2    record in that case, objected to the trustee seeking to bring

3    actions, avoidance actions against investors who redeemed

4    principal.

5            This Court should reject the trustee's theory on how

6    to change the law and it should deny the motion for summary

7    judgment.  Thank you, Your Honor.

8            THE COURT:  Thank you.  Who wants to go next?

9            MR. MUNGOVAN:  I believe that Ms. Passyn, Your Honor.

10           THE COURT:  Okay.

11           MS. PASSYN:  Good afternoon, Your Honor.

12           THE COURT:  Go ahead.

13           MS. PASSYN:  I'm here on behalf of the Joint Defense

14   Group, as well.  And Mr. Mungovan hit a lot of the more

15   substantive merits of the motion -- the trustee's motion.  I'll

16   be addressing two points that are a little bit more procedural.

17           First, I'll be addressing the trustee's claims that

18   he has -- that he has established a prima facie case under

19   Section 548 and 544(b) and, second, I will be arguing that at

20   this stage of the proceedings the trustee should be barred from

21   asserting the position he's asserting right now because it

22   conflicts with statements that he's made in the confirmed plan.

23           THE COURT:  Okay.  Go ahead.

24           MS. PASSYN:  Pointing at the prima facie case which

25   is something that Mr. Kaufman kind of breezed over there at the

**J&J COURT TRANSCRIBERS, INC.**

77

1  end perhaps because he was running out of time, is a threshold

2  matter, I'd like to point out that the trustee has not, as he

3  asserted in his reply, established anything, any of the

4  elements under Section 548 or Section 544(b) of the code.

5  He's --

6          THE COURT:  As I understand it, we're not here on

7  that.

8          MS. PASSYN:  Yes, I know.  I just wanted to point out

9  that he was --

10          THE COURT:  The trustee --

11          MS. PASSYN:  He's asserted --

12          THE COURT:  This issue -- this motion assumes he has

13  a prima facie case.

14          MS. PASSYN:  Yes.

15          THE COURT:  But, and that is so we can reach the

16  value issue.

17          MS. PASSYN:  Yes.

18          THE COURT:  Okay?  And I'm going to make that

19  assumption.

20          MS. PASSYN:  Okay.  Okay.

21          THE COURT:  But, it doesn't matter because it's

22  not -- that is an assumption for purposes of this motion only.

23  So, I had never understood the trustee to be asking for a

24  determination that any part of the prima facie case has been

25  met; any part.  That is not the purpose of this motion.

**J&J COURT TRANSCRIBERS, INC.**

78

1          MS. PASSYN:  Yes, Your Honor.  The point I'm trying

2    to make is that if the trustee is allowed to take the position

3    he's taking now, that he will not -- it should be at odds with

4    his ability to establish a prima facie case, under Section 548

5    --

6          THE COURT:  Because why?

7          MS. PASSYN:  -- and Section 544(b).

8          THE COURT:  Okay.  Now, I understand what you're

9    saying.

10         MS. PASSYN:  Because under Section 5 -- under an

11   actual fraud theory, he needs to prove that there's a present

12   or future creditor.  Under a constructive fraud theory he needs

13   to prove insolvency, and under 544(b) he needs to prove the

14   existence of a creditor.

15         Now, if the defrauded investors are considered equity

16   holders and not creditors, none of the trustee's claims should

17   be able to go forward because he would not be able to prove a

18   prima facie case under either of those subsections.

19         THE COURT:  Okay.

20         MS. PASSYN:  So, to get around this what the trustee

21   has to do is essentially speak out of both sides of his mouth.

22   On the one hand for essentially every purpose that suits the

23   trustee, the defrauded investors are creditors.  For purposes

24   of under an actual fraud theory, they're creditors.  For

25   purposes of establishing insolvency, they're creditors.  For

**J&J COURT TRANSCRIBERS, INC.**

1  purposes of proving that there's an actual creditor under

2  544(b), they're creditors.

3          But, when the defrauded investors tried to invoke

4  that same creditor status for purposes of 548(c), suddenly --

5  and to use Mr. Kaufman's words -- presto chango, they're equity

6  holders.  These are obviously two legally inconsistence

7  positions, and he understands that.  So, to explain himself

8  he's developed this articulation theory that the defrauded

9  investors were -- because they were only exchanging equity

10  interest at the time and they failed to articulate their

11  claims, then it does not constitute value.

12          But, in another 180 degree turn the trustee,

13  himself, there's no articulation requirement for him.  He's

14  allowed to use these unarticulated, unasserted fraud claims for

15  his benefit whereas the defrauded investors are not allowed to

16  do it.  And, for example, to avoid a constructively fraudulent

17  transfer the Court has to look at the solvency of the debtor at

18  the time of the transfer.  But, if the defrauded investors'

19  claims, according the trustee, were never articulated, so if

20  the -- according to him they were never articulated, so if the

21  trustee were actually bound by his own theory, those same

22  claims would not constitute debts for purposes of establishing

23  the debtors' insolvency.

24          So, to get around this he suddenly says that they

25  relate back.  They relate back to the time of the transfers,

1  and he even uses the term "relate back" freely in his reply

2  brief.  Well, either the defrauded investors' tort claims

3  relate back to the time of the transfers or they do not.

4  Either the claims need to be articulated or they do not.

5  Either the trustee's positions are inherently -- are -- either

6  the defrauded investors are creditors or they're not.

7        The trustee's position here is inherently

8  inconsistent.  He should not be allowed to use the defrauded

9  investors' tort claim and status as a sword and a shield.  And,

10 Your Honor, the same principle applies -- it's our position

11 that the same principle applies to the plan.  The trustee's

12 bound by the terms of the plan and the disclosure statement and

13 he should not be allowed to bring a position now that is

14 inconsistent with those terms.  But, Your Honor, the plan uses

15 the term "investor tort claims" no less than 18 times and the

16 disclosure statement uses it approximately 40 times.

17        And the plan defines the term "creditor" the same way

18 it's defined in the bankruptcy code, as any entity with a

19 claim.  It defines "claim" the same way it's defined in the

20 bankruptcy code; "almost any right to payment."  But, nowhere

21 in the definition of claim or plan -- in the plan or the

22 disclosure statement are the words "articulated" or "asserted".

23 In fact, absent from the plan and the disclosure statement is

24 any mention of the trustee's position that because the

25 defrauded investors failed to articulate their claims at the

1  time of the transfers they did not give value under 548(c).

2          He did put up on the screen Section 310 of the plan

3  which said that he would assert bankruptcy claims.  No one's

4  denying that he is allowed to assert bankruptcy claims.  He put

5  that in the plan.  And -- but, what he put up in the disclosure

6  statement is one paragraph buried in the middle of the 50 pages

7  in the disclosure statement and it says at the very end that he

8  may seek the return of principal, based on his theory that the

9  defrauded investors only exchanged equity interest at the time.

10          THE COURT:  Didn't the plan provide for settlement of

11  claims for a return of principal?

12          MS. PASSYN:  It --

13          THE COURT:  Have I missed that?

14          MS. PASSYN:  It did provide for settlement of claims.

15          THE COURT:  Only that was part of -- there was a

16  proposal that creditors could accept a settlement dealing with

17  returns of principal, right?

18          MS. PASSYN:  Yes.

19          THE COURT:  Okay.  Go ahead.

20          MS. PASSYN:  Oh, my -- the point I'm making --

21          THE COURT:  So -- and, so the plan -- I'm sorry.  I

22  told you to go ahead and then I interrupted you.

23          MS. PASSYN:  Oh, sorry.

24          THE COURT:  That's not very polite on my part.  But,

25  so there's never been any question about the fact that these

82

1    law suits to recover principal were going to be brought, was

2    there?

3          MS. PASSYN:  Well, under an actual fraud theory if we

4    didn't act in good faith he could recover principal.  I mean,

5    the point I'm trying to make is that under -- he does not

6    clearly assert that he was actually going to say that we -- our

7    equity interest because our tort claims were not articulated at

8    the time, he does not say that those do not constitute --

9          THE COURT:  So, there's --

10         MS. PASSYN:  -- value and that he was, in fact, going

11   to do this.

12         THE COURT:  So, your argument is that because the

13   trustee didn't tell you what his exact legal theory was,

14   although you knew you were going to get sued you didn't know

15   exactly what the reasons were, is that the problem?

16         MS. PASSYN:  My argument is a little bit more along

17   the lines of all throughout the plan, all throughout the

18   disclosure statement, he refers to us as creditors.

19         THE COURT:  Okay.  I understand that.

20         MS. PASSYN:  His entire -- for every purpose that

21   suits him, he refers to us as creditors.  He should have

22   referred to us as investor equity claims, investor equity

23   holders.  He could've done that, and he didn't.  He referred to

24   us as creditors.

25         And so it's our position that he should be barred by

**J&J COURT TRANSCRIBERS, INC.**

83

1  res judicata, judicial and equitable estoppel because at this

2  point in time in the proceedings it would be inequitable for

3  him to do this.

4         THE COURT:  Okay.  Anyone else wish to be heard on

5  those two issues?  I want to --

6         UNIDENTIFIED ATTORNEY:  Your Honor, I'd like to be

7  heard at some point.  I don't know if it's appropriate now.

8         THE COURT:  Well, now would be a good time because

9  I'm about to disagree with her on this -- on the second issue

10 while we're here.

11        COURT CLERK:  See if that microphone will move into

12 that table, so he doesn't have to --

13        UNIDENTIFIED ATTORNEY:  Sure, just slide out of the

14 way.

15        THE COURT:  And the reason I say that is, so Mr.

16 Phillips -- I'll give anyone else an opportunity.

17        COURT CLERK:  I think you can pick it up and pull it

18 and it will come, if you want to just go to the table.  Are you

19 okay?  Okay.

20        UNIDENTIFIED ATTORNEY:  It pulls down.  Is that -- is

21 this fine, Your Honor?

22        UNIDENTIFIED SPEAKER:  Yeah, that's --

23        THE COURT:  Yes, that works.

24        UNIDENTIFIED ATTORNEY:  Okay.

25        THE COURT:  The point simply is, as I've expressed

**J&J COURT TRANSCRIBERS, INC.**

throughout this case, basically, I had sever questions about

why we even had a plan and Mr. Perkins, Mr. Kaufman, Mr.

Bernardino, this is one of the reasons why I think plans in

cases like this may not make much sense because you end up

litigating what is essentially a bankruptcy issue and that's

the way I see this.  I see this as a trustee for this estate,

or these estates consolidated, seeking recovery against these

defendant; period.  It's a matter of bankruptcy law.

        To me, what the plan says makes no difference.  The

definitions in the plan don't control this case one way or the

other, and that's why I was asking about -- there's a

potential, I suppose, for the binding effect of a plan that

doesn't clearly state that claims or causes of action are going

to be pursued.  I don't think that the terms of the plan in

that regard are unclear about the fact that these types of

claims are going to be pursued.  And this would be a good time

for anybody who has a contrary view to let me know.

        The fact that this complaint or this motion

articulates a different theory of recovery of these amounts

does not, in my judgment, amount to equitable estoppel,

judicial estoppel, or issue preclusion or claim preclusion.  I

do not see that it's preclusive in any way.

        So, I'm happy for anybody else to convince -- now

would be a good time for people to convince me that I have

missed something in that analysis.  Mr. Phillips, maybe you can

**J&J COURT TRANSCRIBERS, INC.**

85

1   start.

2          MR. PHILLIPS:  Your Honor, that's really not my issue

3   or why I'm here to talk today --

4          THE COURT:  Okay.

5          MR. PHILLIPS:  -- so, if you want to hear somebody

6   else on that then --

7          THE COURT:  I'll hear anybody else want to hear

8   about --

9          MR. PHILLIPS:  -- I'll have to defer.

10         MS. PASSYN:  No, but I can remind you to make that

11  first point, too.

12         THE COURT:  Well, I hadn't gotten to that.  I hadn't

13  gotten to that one yet.  Yes, ma'am, in the back.  Sure.

14         MS. PEOPLES:  I think the problem of going along with

15  the presentation a moment ago -- and my name is Valerie

16  Peoples.

17         THE COURT:  Thank you.

18         MS. PEOPLES:  I am a pro se defendant, former lawyer

19  -- is that to make matters worse, at least in terms of my

20  understanding of my reading and hearing about the plan, was the

21  conversation I had with counsel.

22         When I initially, back in 2007, called their office

23  because I had heard about the matter through my relatives who

24  are also involved in this litigation to say I hasn't got any

25  paperwork, my question to them was, is there anything that has

**J&J COURT TRANSCRIBERS, INC.**

1  that I've missed?  Are there any particular documentation that

2  I needed to look at?  Had they at the time engaged me in the

3  conversation and said, you know this action has been going on

4  for 2006.  I said to him, where is it?  And at that time the

5  conversation was such, we'll put you on your mailing list and

6  if anything occurs we'll let you now.

7       That -- at that particular time, at least, I would

8  have been in a better position to be responsive to a plan or be

9  responsive to whatever issues arose instead of going almost

10  from that point in time last summer until January receiving a

11  formal complaint then engaging in the behavior of trying to get

12  records which have been destroyed, which have made the

13  possibility of settlement impossible to be involved in this

14  process.

15       It's just really -- I'll say this, I really felt as

16  though I was further being conned.  It was bad enough that I

17  had my experience with Kirk Wright believing that after I had

18  gotten out of the case that several years had gone by.  I knew

19  the records weren't correct, for them to also be convinced that

20  the records they had were correct and not to be able to get

21  bank records is a horrible position for an investor to be in.

22  And the level of time and energy and resources that this takes

23  and the fact that it has physically made my sick, I've spent

24  more money at the Natural Path from the stress of this than I

25  care to think about.

1          So, to allow them to create that impression is

2     unfair.  And then for him to get up and stand here and then

3     give the Court the impression that we've tried to work with the

4     investors, to the best of our ability, is not true.  I have

5     spent more time trying to say okay, do you want this evidence,

6     do you want that evidence, and jumping through jumping jacks.

7     It is not fair and it is the thing that, quite frankly, from

8     where I sit in the jurisdiction of New Jersey that I have been

9     in borders on a level of lack of ethics in terms of the level

10    of which this has gone on.  Thank you.

11         MR. KAUFMAN:  I take exception to every single thing

12    she said.

13         THE COURT:  Okay.  Thank you.  Thank you.  I'm not

14    going to get into that because that's not what we're here about

15    today, so I hear what you're saying.  I'm sorry you had these

16    problems -- that you think you had these problems, I should

17    say.  I don't know whether -- the merits of them.  I'm not

18    going to get into that, so the trustee, committee counsel don't

19    need to worry about responding to that because that's not

20    before me today.  That issue is not really relevant to this

21    issue, in any event.  This is a strict legal issue, the way I

22    see it, based on the undisputed facts.  Go ahead, Mr. Phillips.

23         MR. PHILLIPS:  Okay.  Good afternoon, Your Honor.

24         THE COURT:  Well, wait a minute.  Anybody else have

25    anything to say about the judicial estoppel or the preclusive

**J&J COURT TRANSCRIBERS, INC.**

88

1   arguments?

2                    (No audible response)

3            THE COURT:  Okay.  I reject those arguments and

4   that's the ruling for those reasons on that issue.  Okay.  Go

5   ahead.

6            MR. PHILLIPS:  Okay.  Good afternoon, Your Honor.

7   This is Chris Phillips on behalf of the defendants David

8   Wisneski and Michelle Peoples Wisneski.

9            I just want to highlight a couple issues that are --

10  if not -- that only my clients hold, that only a couple of

11  defendant hold.  I just want to bring them to your attention.

12           I know the trustee has said several times that, you

13  know, the ruling on this motion has no effect on a defendant's

14  ability to raise particular issues.  I am somewhat concerned

15  that any adverse ruling would have some sort of preclusive

16  effect on my clients, thus I want to raise these issues.  You

17  can keep them in the back of your mind, but these, to my mind,

18  are very significant.

19           The first and most important issue is that it seems

20  pretty clear that the trustee's case, if not entirely, largely

21  relies on the existence of these limited partnership

22  agreements, or I guess they're also called limited liability

23  company agreements.  I did some very limited discovery during

24  the course of this for-value motion trying to request those

25  documents from the trustee.  The response was, those documents

                    J&J COURT TRANSCRIBERS, INC.

1  don't exist.  I think the trustee's -- or I -- actually I know

2  the trustee has now supplemented his affidavit saying, these

3  agreements don't exist as to these particular defendants, and

4  my clients are two of those defendants.

5       You know, one thing I do take issue with though is

6  that I think is his reply brief the trustee said that we had

7  presented no evidence to show otherwise that we were not equity

8  members, and I take issue with that first three --

9       THE COURT:  Well, hold on.  Let me -- because I've

10 read your brief and I understand your position and I'm not

11 ruling on that issue today.

12       MR. PHILLIPS:  Okay.

13       THE COURT:  That issue is not here today.  I

14 understand the concern of lawyers wanting to make sure, but I

15 read Mr. Kaufman's reply or whatever the reply was as saying

16 that's not on the table.

17       What we're talking about today is if -- if you're --

18 I'm not even going determine that people who signed a limited

19 partnership agreement or limited liability company agreement

20 are equity investors.  That's not the issue, I don't -- as I

21 understand it.  It seems to me if you've signed something that

22 says I'm going to be a member in a limited liability company

23 and I'm going to make a capital contribution and I'm going to

24 get profits, that sort of indicates it's an equity investment.

25       But, that's not the purpose.  The purpose is assuming

**J&J COURT TRANSCRIBERS, INC.**

90

1   one has invested on an equity basis so that one's investment is

2   characterized as an equity investment, does that person have

3   the ability to assert a value based defense?  That's the issue

4   as I understand it.  So, there's -- your clients are in no way

5   prejudiced by this motion --

6          MR. PHILLIPS:  And I appreciate that, Your Honor.

7          THE COURT:  -- on that -- on whether they an equity

8   interest.  I don't remember whether it was your defense or

9   somebody else raised the question of interest.  Is that what

10  you're about to get to, or did somebody else raise that issue?

11         MR. PHILLIPS:  Well, I'm not sure that I follow you.

12  One of the things, we did have an attachment to our brief that

13  clearly showed that the understanding between the parties that

14  were -- was that we were clients or customers and that we had

15  accounts.  You know, that's --

16         THE COURT:  That's not the issue before me today.

17         MR. PHILLIPS:  Right.

18         THE COURT:  So, we don't have to worry about that.

19  Somebody raised the issue that as part of the recission claim

20  they were entitled to interest which would --

21         MR. PHILLIPS:  No, that wasn't my clients, Your

22  Honor.

23         THE COURT:  -- permit them to raise the value

24  defense with regard to any amounts received in excess of the

25  principal, and I don't know whose that was.

**J&J COURT TRANSCRIBERS, INC.**

91

1          MR. BARLOW:  That was us, Your Honor.

2          THE COURT:  Was that you?

3          MR. BARLOW:  That was Nixon Peabody on behalf of --.

4          THE COURT:  That's not here today either.

5          MR. BARLOW:  I understand, Your Honor.

6          THE COURT:  Okay.  So, you won't have to get up and

7    tell that.  Okay.  So, what was your other --

8          MR. PHILLIPS:  The only other other small matter I'd

9    like to point to is another premise, I think, of the trustee is

10   that these equity interests were, in fact, worthless, nearly

11   valueless to the time of the transfers.  And I think that

12   relies on one large premise, and that's the existence of the

13   Ponzi scheme.  And then we all know Ponzi schemes.  The case

14   law says Ponzi schemes are insolvent from the inception.

15          Well, Your Honor, you know, there's been -- and I

16   know this goes to his prima facie case, but there's been no

17   showing there's a Ponzi scheme and more importantly for my

18   clients is that my clients' transactions occurred back in 1999

19   and I'd submit, Your Honor, there's more than the possibility

20   to there was no Ponzi scheme in existence at that time.

21          And, you know, that brings me to another point is the

22   fact that these actions,  many of them, definitely against my

23   clients were filed, well we think, outside of the statute of

24   limitations.  I know you have that brief before you on that

25   issue.  That's something separate and apart.  But, you know, I

1  think that's another issue the Court needs to be aware about

2  that, you know, while the trustee can make the argument that

3  these equity interests were worthless, there's been no showing

4  that they were worthless.  And so I --

5          THE COURT:  All right.  I'm assuming there was a

6  Ponzi scheme.

7          MR. PHILLIPS:  You're assuming there's a Ponzi

8  scheme?

9          THE COURT:  I'm not deciding that issue.

10          MR. PHILLIPS:  Yes, Your Honor.

11          THE COURT:  Because if there's no Ponzi scheme, the

12  trustee's case goes away, as I understand it.  Am I right, Mr.

13  Kaufman?

14          MR. KAUFMAN:  Your Honor --

15          THE COURT:  Your actual fraud case goes away.

16          MR. KAUFMAN:  The actual fraud case goes away.  The

17  constructive fraudulent conveyance doesn't.  And, frankly, I

18  haven't given much consideration to it because the prospect

19  that in the light of what we know, Mr. Wright's criminal trial,

20  the history of all of this, that if this isn't a Ponzi case, I

21  don't know what world I'm living in.  But, that's not for

22  today.

23          THE COURT:  So, I'm assuming the existence of a Ponzi

24  scheme.

25          MR. PHILLIPS:  Yes, Your Honor.  Okay.  I just wanted

**J&J COURT TRANSCRIBERS, INC.**

93

1 to bring --

2 THE COURT: And I'm not today deciding the statute of

3 limitations issues. And I'm not decided there was a Ponzi

4 scheme.

5 MR. PHILLIPS: I realize that, Your Honor. I just

6 want to bring those matters to your --

7 THE COURT: No, I --

8 MR. PHILLIPS: We're here in court and lawyers like

9 to talk in court, and that's what I'm here for.

10 THE COURT: Well, I understand. Judges like to talk

11 in court, too. It's been very difficult for me.

12 MR. PHILLIPS: All right. Thank you for your time,

13 Your Honor.

14 THE COURT: Thank you. Okay. Any other issues need

15 to be presented before we go back to Mr. Kaufman? Okay. Go

16 ahead.

17 MR. KAUFMAN: Thank Your Honor. I'll be as brief as

18 I can. I'm going to try to track along with the comments first

19 by Mr. Mungovan and then address the issues of the talking both

20 sides of the mouth about the creditor on one occasion and then

21 equity on another.

22 Let me start first with the notion of that this was

23 debt from the inception and the notion that in Ebby the

24 contention is that it was not, and that the cases that we cite

25 as claim-to were not claim-to. Let me say at the outset that

**J&J COURT TRANSCRIBERS, INC.**

94

1   for purposes of fraudulent conveyance analysis, we're obviously

2   looking at the redemption event as the fraudulent conveyance.

3   That's separate and distinct from -- and we acknowledge it's

4   distinct from whether or not there was inceptive fraud or not.

5            The issue for the Court from the standpoint of

6   claims-to analysis, though it's not binding.  In other words,

7   even if there were to be a case or two, other than <u>AFI</u>, that

8   had even reached the conclusion in an equity case, none of the

9   cases whatsoever deal with any of the arguments we've advanced

10  as to why transmutation without articulation work or deal with

11  any of the issues we've raised in the bankruptcy code that it

12  runs afoul of or a State law that it runs afoul of, none of

13  which are discussed essentially by any of the parties who brief

14  this in opposition.

15           But, to get first to the claims squared analysis, to

16  the extent they're saying this is a body of law that is out

17  there, they're taking the position first that <u>Ebby</u> is a case

18  that is an equity case.  It is not.  Let me go back to <u>Ebby</u>,

19  itself.  One second, Your Honor.  Lost it my pile.

20           Quoting again from the very section we talked about

21  before, "At the time it was made, Young owed Ashley 3,000 for

22  money actually paid to him.  In other words it was a debt."

23  Then it says, "which actually has a right to recover because of

24  the moment he was deceived into paying it."  Both things are

25  true, but both things are creditor based notions.

**J&J COURT TRANSCRIBERS, INC.**

95

1          And so to the extent that one wants to say, well, I'm

2    going to in every case look at the status to begin with and

3    give them a creditor claim for restitution, that would

4    emasculate everything that we're saying.  Of course, that's the

5    case of what they're arguing.

6          When Mr. Mungovan makes the argument that none of

7    these cases, at all, address the equity debt distinction, that

8    is precisely the point we're making and the fact is that none

9    of them make that distinction because none of them are focused

10   at all about dealing with an equity or debt because they all

11   deal with creditor claims.

12         Now, let me go specifically --

13         THE COURT:  Well, if there was a debt in <u>Ebby</u> --

14         MR. KAUFMAN:  Then it's a --

15         THE COURT:  -- why would they get into the -- why

16   would they have to get into the restitution issue?

17         MR. KAUFMAN:  Well, how much do they get into it?  I

18   mean, it's --

19         THE COURT:  Well, but why would they get -- why would

20   they even mention it?

21         MR. KAUFMAN:  Your Honor, in a way it's surplusage.

22   I mean, first of all, the entirety of -- if we were trying to

23   source anything in <u>Ebby</u>, I mean, we're looking at three lines.

24   We can, you know, blow them up as large as we want, but all it

25   is -- it basically is a statement is that there was a

1  deception.  No one is confused, at all --

2          THE COURT:  Is _Ebby_ a --

3          MR. KAUFMAN:  _Ebby_ is the Fourth Circuit case from

4  1920 that essentially says virtually nothing about it, other

5  than acknowledging that there was a fraud claim from the

6  get-go.

7          The fact of the matter is, what that Court does is

8  reach the conclusion that they're going to get back the

9  profits.  This statement about the right to recover the

10 principal because of fraud is surplusage, as it happens in all

11 of these cases.  Why they get into it, I don't know.  But, the

12 fact of the matter is that any of these cases that get into

13 talking about a claim for fraud and then go through an analysis

14 all devoid of transmutation as an argument get into it for

15 reasons that have no real necessity because there is no

16 question, Your Honor -- and I want to deal with this right now

17 in terms of Stanford and Madoff and, in fact, _Bayou_.  Let me

18 handles those right --

19         THE COURT:  You can do that, but what's going on in

20 those cases has absolute no--

21         MR. KAUFMAN:  Well, I --

22         THE COURT:  -- absolutely no relevance to me.  I

23 could -- I care because I'm worried about what happens in other

24 courts and what happens to other people, but that has no

25 relevance to my decision.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KAUFMAN:  But, I understand, but I --

2          THE COURT:  I'm not going to go find out what's going

3    on in those cases.

4          MR. KAUFMAN:  Okay.  All I want to say about them is

5    that they are debt cases.  That's the reason.  And <u>Bayou</u>, by

6    the way -- I mean, Mr. Mungovan raised the <u>Bayou</u> case and said

7    he talked -- we talked, as well.  Let me just mention that

8    decision.  The <u>Bayou</u> decision is a decision that they say, well

9    the -- they're actually dealing with profits and they're saying

10   the trustee is not contending that the transfer of --

11   retransfer or payment of principal constitutes something

12   avoidable.  That was the prerogative of that trustee.  That is

13   not the position here.  We talked to them, as well.  They were

14   looking primarily at a substantial body of good faith questions

15   because there was a whole run on the <u>Bayou</u> estate.

16          And, so the vast majority of the claims that they

17   brought were brought where parties had actually gotten some

18   information and got -- made a run on <u>Bayou</u> and that's what

19   happened.  All of those were bad faith and, so they litigated a

20   whole bunch of those and a couple people say it was

21   serendipity.  I just happen to make my claim the day this was

22   happening, but I had no inside knowledge and the Court

23   determined that.

24          That case was primarily a good faith/bad faith case.

25   Our case -- we're not -- and Mr. Bernardino asked me to say

this again, we're not stipulating that all these people
operated in good faith.  We don't have the proof at this point,
but it's to say that our fundamental focus right now is for-
value.  If some of these people can't prove good faith which is
their burden then they won't have good faith.  But, what we're
primarily focusing on -- and it's only for today's purposes, is
focusing on for-value.  And in the for-value cases the question
is, is there an antecedent debt or not?

         And we're saying the contrivance that they had a
claim is not an antecedent debt unless it gets articulated.
You can't make the argument to say that I have a claim that
hasn't been articulated when it arose from debt and when it
arose from equity.  And the distinction is critical, absolutely
critical to the analysis because if I'm simply taking a
position where I have a debt -- let's look at M&L, the case --
the promissory note case from the Tenth Circuit that was cited.
M&L is a case where it was a note.  The Court then went on to
say, gee, you've got a restitution claim, as well.  Well, if
it's a note, you never need to get to the restitution claim.
It is total excess.  It doesn't matter because if we were in
that situation, if these people hadn't signed equity agreements
and they have no other defense about it other than, you know,
as Your Honor intimated today, not the day they decide that
that's definitively the answer, but if they hadn't been signing
those kind of agreements but had made debt infusions, as was in

99

1  Madoff and Stanford and some of the other cases, we would not

2  be here today.  We would not be here today.  It is the

3  distinction between making an investment in equity and making

4  an investment in debt that is everything, because if it is debt

5  from the get-go, M&L is that case, and I'm going to show you

6  that in the case -- the <u>Bath</u> decision from Utah against Judge

7  Maybee (phonetic) and others, that it's the same, all of those

8  cases stand for the proposition that it was debt from the

9  get-go.

10       Let me, by the way, while we're right on it, talk

11  about <u>Independent Clearing House</u>.  Mr. Mungovan goes to the

12  argument that this is a case that was a decision premised on

13  looking at the original transaction and saying, gee, there's

14  all the evidence that these people were defrauded.  That may be

15  the case of an observation that there is such a notion, but

16  there is no question that this was debt.  Quote, from Page 7,

17  77 B.R. 843 and it's Page 7 in the slip, "The undertakers

18  signed contracts by which they committed to one of the clearing

19  houses a specified sum of cash, credit or other commodities for

20  a period of nine months.  The funds committed to the clearing

21  house were to remain under the clearing house's custody and

22  control until the end of nine months at which time the

23  principle amount was to be repaid."

24       There's no question.  That's a claim.  It's a debt.

25  And then, to quote the section that later Mr. Mungovan himself

1   quoted, it underscores the fact that this is claim squared.  On

2   Page 16 from the slip opinion, "From the time a defendant

3   entrusted his money to the debtors, he had a claim against the

4   debtors for the return of his money."

5          We believe that the code definition of "debt" and its

6   related terms is broad enough to cover the debtor's obligations

7   to return a defendant's principal undertaking, whether that

8   obligation was based on the contract between the debtors,

9   claim, number one, and the defendant -- I forgot the -- between

10  the debtors and the defendant, or was based on the defendant's

11  right to restitution.

12         THE COURT:  So, but that raises the same question.

13  If there's not a question of equity in the case, why is the

14  Court talking about the claim for restitution?

15         MR. KAUFMAN:  That is an interesting and insightful

16  question that I questioned when I looked at it, because all of

17  these things look like they're surplusage.  And because there

18  is no need -- if you look at it, and I looked at it from the

19  same perspective in a way -- and I'm not trying to suggest

20  you're buying this, Your Honor.  I don't know how you're

21  thinking.  But, when I looked at it, I said, wait a second.  If

22  this is a claim to begin with and now it's going to be this

23  other kind of claim, would I, if I got that far as a jurist,

24  say, well, wait a second, there's a problem of this whole thing

25  being an equity interest from the get-go and getting into all

101

1  the case laws about how you treat equity and the distinctions

2  between equity and any notions of under 5-10(b) about

3  transmuting somebody from one thing to another, you would never

4  get there because why would you need to.  You're not trampling

5  on anything.  You're not changing the character of what

6  somebody is.  A claim, is a claim is a claim.  They're

7  entitled, absent some unique circumstances of subordination, to

8  ratable treatment among themselves.

9        So, if I've got a claim five different ways from

10  Sunday, so be it.  I mean, all you can do is get your claim

11  back.  You're owed an obligation.  And so claim squared is in

12  none of these cases that he suggests, including -- the only one

13  where it arises in equity is the AFI case which I've explained

14  reaches the conclusion -- and you can go back and look at the

15  history.  It's basically distinguishable in two cases.  It

16  simply has one sentence that simply says, because they had this

17  restitution claim, ipso facto, they win and then there's no

18  analysis of any of the points that I'm suggesting.  That is the

19  singular case out there that we could find.

20        In the Terry case, quite to the contrary, when he

21  says it's not about restitution -- let me read from the Terry

22  decision.  "Even if the Court assumes that the defendants were

23  defrauded, the Court is of the view that the restitution

24  defense advanced in their briefs is invalid as a matter of law.

25  There is no precedent for the proposition that dividends paid

**J&J COURT TRANSCRIBERS, INC.**

1   to a stockholder may be recharacterized in satisfaction of some

2   kind of debt."  And he's saying "some kind of debt" in the

3   context of a restitution claim that arose out of an issue.

4          Now, granted, this was not technically a Ponzi

5   scheme.  It was a fraud case, but it was, nevertheless, a

6   restitution based analysis that was being rejected because the

7   Court says you can't simply recharacterize it.  And so

8   everything turns on the recharacterization.  So, even if there

9   were some other case out there, which I can't find, that goes

10  through this labyrinthal (sic) analysis of the restitution that

11  actually arose in an equity case, so be it.  So, there's

12  another case that's out there.  The point is none of them --

13  this is the first forum that I'm aware of and so I don't think

14  I'm changing the law, slight of hand, or anything else, or

15  doing anything nonsensical -- no pejoratives intended -- I am

16  simply making the argument that this is essentially a slate

17  which has not been written on and where no Court has really

18  examined the notion of the contrivance, what I call the presto

19  chango, the slight of hand, the prestidigitation, whatever you

20  want to call it, legerdemain, of changing the notion of

21  something that started out as equity and turn it into debt

22  without all the panoply of procedurals that should attend any

23  of that and without giving cognizance that to do so reaches the

24  point of flying in the face of the Code.

25          Now, Mr. Mungovan, under 548(c) says, gee, this would

**J&J COURT TRANSCRIBERS, INC.**

1    be nonsensical, I wouldn't come in and say, here I am, I'm a

2    tort victim, because it would compromise 548 and that he's

3    somehow making this a duty for them to do.  I'm not suggesting

4    remotely there's a duty on behalf of the investors who didn't

5    know about it.  That's a nonsensical -- that is a nonsensical

6    point.  What I'm saying is that to utter the contrivance that

7    they have an unarticulated claim and that they therefore have

8    it without ever asserting it, flies inconsistent with the

9    notion of 548 itself.  That's all.  I'm not trying to

10   over-blow it.  I'm --

11          THE COURT:  And presumably without the consequences

12   of it.

13          MR. KAUFMAN:  Without any adverse consequences.

14          THE COURT:  Because the consequence of asserting the

15   claim is the inability to recover on it.

16          MR. KAUFMAN:  Precisely.  Now, so, that --

17          THE COURT:  Because of the bad faith.

18          MR. KAUFMAN:  Correct.  Now, I'm almost done, Your

19   Honor.  Mr. Mungovan says, this is going to wreak havoc.  I

20   mean, the reality is that in all of these cases, it's a

21   tragedy.  When you have a Ponzi scheme, whether it's Madoff,

22   and we've all seen it on TV and played out, and while the

23   injured plaintiffs, maybe they're too poor to even be here, the

24   would-be recoverees here, and a lot of them have lost all their

25   money, it's a tragedy for them.  I'm not saying it's any luxury

1  here, that the people that are here are having to deal with the

2  consequences and have no door knocked on.  Some got all their

3  money back.  Others got some of their money back.  It may be a

4  difficult situation for everybody.  It is not pleasant.  But,

5  the question is not whether it's pleasant or not.  It's not a

6  question of whether there's some kind of need to have

7  adjudication.  It's getting to what the law requires.

8          Second, I would say, to Mr. Mungovan's point about

9  spending excess of the estate, a very small part of the

10  estate's total commitment has been devoted to this process.

11  One of the things that exacerbated it was all the debate about

12  who was going to be on the committee and who could do this and

13  whether we had an independent right to proceed and that cost us

14  volumes.  That's for another day, if it's ever.  But, the point

15  is, a very small factional share, well under ten percent, well

16  under ten percent of the amount of money spent by the debtor

17  estate, has been devoted to the pursuit of this action.  And if

18  it means recovering a substantial amount and a principal source

19  for recovery for a lot of investors that have nothing, that's a

20  cost of doing business.  But, it is modest, very modest.  A

21  modest amount, a small fraction of our fees, have been devoted

22  to actually the pursuit of this claim.  And once we got into

23  the position to have the right to do so and work through that,

24  a small amount has been spent devoted, to that.

25          Okay.  Now, let me turn finally to the 544, 548 set

**J&J COURT TRANSCRIBERS, INC.**

1  of issues raised by --

2             MS. PASSYN:  Ms. Passyn?

3             MR. KAUFMAN:  Ms.?

4             MS. PASSYN:  Passyn.

5             MR. KAUFMAN:  Ms. Passyn.  And I apologize.

6             MS. PASSYN:  That's okay.

7             MR. KAUFMAN:  That's bad of me and that's not good.

8  Ms. Passyn.  She made an impassioned argument that we're

9  talking both sides of our mouth and without any further

10 castigations attributable, that we can't argue it both ways.

11            Well, first of all, let's get to the end point.

12 Obviously, the end point is whether, under establishing a

13 constructive fraud where we have to show insolvency, whether

14 under Whiteford Plastics, we have to demonstrate that either

15 this is for the benefit of creditors or have the other view

16 taken in the Bayou case that this is so akin that it's the same

17 or, third, to satisfy Moore v. Bay requirement that there be at

18 least a creditor in existence at the time the avoidance action

19 that is being pursued occurs.

20            All of those are dependent, one way or the other,

21 save for the Whiteford separate point, on the question of

22 whether or not the estate was insolvent and whether these

23 parties can be creditors.  And the point raised by Ms. Passyn

24 is, how do you have it both ways?  Well, it's not difficult and

25 it's not trickery or anything else, and aside from the plan

106

1 which you've disposed of.  The simple answer is a question of,

2 what is it that we're looking at?

3        On the one hand, we're looking at this Court in a

4 judicial process, with open notorious full notice,

5 notwithstanding what the woman who came up here earlier said,

6 is doing, is under the plan, is validating the fact that

7 people, save for those who got their money back, are now, for

8 then, entitled to have a claim.  That's what courts are all

9 about.  The fact that the claim relates back in time and is

10 given rise to at the date they were induced to render or tender

11 their money, is not inapposite or is not frustrative of

12 anything we're saying.  It is to say that this Court looks at

13 the claim.  The claim arises prior to the bankruptcy, well back

14 in time.  The Court is now acknowledging that claim and is

15 giving debt status to it.

16        The fact that it's doing it now is not the same

17 question of whether -- of anything other than to say, if I now,

18 the Court, recast the state of play at the time that that

19 transfer -- or that transfer into the estate occurred, and all

20 of these claims came into the -- or all of these investments

21 came into the estate, they were all worth, for years and years,

22 and Mr. Phillips is quite right.  You know, we're going to have

23 to, at some point, prove insolvency at an earlier year, but we

24 believe, and I believe Mr. Perkins is going to be able to

25 testify and demonstrate through records that this was an

**J&J COURT TRANSCRIBERS, INC.**

insolvent estate for a long period of time.  Whether Mr.
Phillips is right that it goes back to '99, I'm not a forensic
expert and can't prove, but I am here to say that for a very
long time, it was in one pocket, out the other, to somebody who
wanted their money back.

          And, so, the issue is, was it insolvent at various
points in time?  Well, Your Honor can take a look at all these
claims that are now being blessed for having been defrauded,
looking at then, whenever it is time, how much money was in the
estate to deal with the claims that were X'd in at that time
and determine that, in fact, it was woefully insolvent and that
the monies paid were, like, you know, a hundred cents on the
dollar --

          THE COURT:  But, the argument is, they weren't claims
at the time.  You're saying they're not a claim.

          MR. KAUFMAN:  They are --

          THE COURT:  If I understand the argument, that's the
-- the argument is they're not a claim.

          MR. KAUFMAN:  No.  The argument --

          THE COURT:  Your argument is they're not a claim.

          MR. KAUFMAN:  My argument is they were not a claim.
My argument was that they were not -- that it wasn't a claim is
not the argument.  I'm saying they had a claim.  The problem is
not the claim, and as Mr. Mungovan said, umpteen different
places we've acknowledged the claim arises as of the time that

1    they made an investment.  We're not debating that they have a

2    claim.  It is the treatment of an unasserted claim.  Now, that

3    they have it and are asserting it, it's the treatment of it

4    today.  You can go back and say, yes, they had a claim.  So,

5    as I construct the balance sheet for 2002, there was $100

6    million chasing $4 million that was in the bank at the time.

7    The case was totally insolvent.

8           THE COURT:  But, it was a hundred million dollars of

9    equity interest.

10          MR. KAUFMAN:  But -- they're equity interests, Your

11   Honor, but I'm saying they had -- it was an equity interest and

12   there was an inchoate.  That's the point.  There was an

13   inchoate ripe to assert that hadn't yet been asserted, but

14   fairly done.  If Your Honor now goes back and constructs the

15   balance sheet of the company based upon now determining for

16   back then, in open notorious fashion what the structure of the

17   company was at the time, at the time the company was insolvent.

18   There's no inconsistency.  The mere fact that we're saying they

19   were equity from the get-go doesn't mean that they didn't also

20   have a claim.

21          The problem is not that they didn't have a claim.

22   It's the transmutation to acknowledge the existence and pay on

23   the claim without it being articulated.  The difference between

24   this Court and what happened is, Your Honor is now looking at

25   it in full due process and saying, I now bless all of these

**J&J COURT TRANSCRIBERS, INC.**

1  people for having a claim, and that claim relates back.  What

2  happened when the transmutation event happened, or the

3  redemption event happened is, people were perceiving a totally

4  different world.  They thought they were just getting their

5  money back and there was no fraud and nobody knew anything.

6           So, the question of creating the artifice of having -

7  - this fact that there's a claim now is not inconsistent, at

8  all, with the fact that the claim existed to begin with, just

9  never ripened to a point of having been determined adjudicated,

10 found, articulated, resolved as such and those two things are

11 not inconsistent, whatsoever.  If that inconsistency bedevils

12 our case, then we're done.  But, I submit to you that there is

13 nothing remotely wrong with this Court saying, today, I hereby

14 look at the situation and bless everybody, including all the

15 investors who got snookered who didn't get a cent back, that

16 you're all entitled to have a claim.

17           This was an insolvent estate.  Let's face it, you

18 were all defrauded.  But, it's another thing to look at the

19 date of the transmutation -- or of the redemption event and

20 just with a flick of the wrist, say, we'll give you an

21 unarticulated claim because it runs inconsistent with the whole

22 notion that the process of making a claim out of an equity is

23 not to be manufactured on the quick, you know, snap of the

24 fingers.  That's the essence of the case.  And Your Honor has

25 got to grapple with that because, I submit, that's where the

1  rubber meets the road.  It meets the road both in terms of the

2  544 analysis and it is where the rubber meets the road in

3  accepting the artifice of creating this artificial notion of

4  the fact that they were recovering in respect of a claim when

5  nobody knew anything remotely about a claim.  That's where the

6  case is.

7          In my view, it's a first impression.  It's not

8  contrary to anything.  It's a first impression because we're

9  really dealing with the first court dealing in an equity case

10 where you have to struggle with that analysis.  That's what

11 I've been saying for a couple of years and I appreciate the

12 Court's indulgence.  Happy to answer any questions.

13         THE COURT:  Why should the result be different

14 because of the form of the transaction when the transaction is

15 fraudulent?

16         MR. KAUFMAN:  The result should be different, Your

17 Honor, because it's in the nature of what they signed.  Your

18 Honor went back and you said it a few minutes ago.  I'm not

19 binding Your Honor to find that they're equity, but they

20 executed equity documents.  If we're going to basically say the

21 distinction between equity and debt shouldn't matter when fraud

22 obtains, then the whole notion of our jurisprudence goes out.

23 I mean, there's always been a notion that creditors get paid

24 first.  You make a volitional decision in a case to invest.  I

25 can't control why, in one limited partnership -- or one hedge

1  fund case -- and I fully anticipated Your Honor asking this

2  question, I mean, this is no surprise.  Why, in one Ponzi

3  scheme case where the parties invested in debt, Outcome A, in

4  another Ponzi scheme case, they invested as equity, Outcome B?

5  That is simply -- you know, the world is not perfect.  Not

6  everything comes out the same.  There are consequences to

7  executing documents that create a different dynamic.

8       If I have a right to payment -- if we're going to

9  obliterate the distinction between a right to payment and say,

10 oh, that's all really sort of one and the same as here's an

11 equity money, you're managing my money one way or the other,

12 it's to basically destroy the whole notion of documents and the

13 purposeful nature of what people sign.  And so I admit to you,

14 Your Honor, that the Madoff people -- I thought at first -- I

15 said, oh, my God, there's hundreds of billions of dollars or

16 tens of billions of dollars of money that ought to be looked at

17 and it turns out, it looks like the structure they made there

18 was debt.  It's serendipity.  Those people may be unfortunately

19 up -- a paddle -- without a paddle.

20      But, this case is not that and there are any number

21 of other cases that are equity cases where the nature of the

22 investment and the risk taken was one that put them in a

23 situation that are not to be preferred and it's as simple as

24 that.  And I don't -- it's something that we recognized from

25 the get-go was going to be existent and that, you know, this

1  case turns on equity versus debt and, gee, they signed these

2  agreements.  But, that's the nature of it and it's not really

3  being harsh.  And, in that sense, I don't find this harsh

4  because, in reality, you come back to the notion of fairness.

5          If I'm an investor that's sitting in this room, why

6  are you coming to bother me?  This has been a tragedy for me.

7  If I'm sitting out there talking to the 150 people who have

8  lost $100 million and don't have one cent of it, some of them

9  totally destitute, those people are saying, how could this

10  happen, how do I -- why is it that I don't have some means of

11  recovery?  And the answer doesn't come from, gee, you're right

12  because you got a perspective and the other person is right,

13  leave sleeping dogs lie.  The answer comes from, sometimes the

14  law provides a remedy, sometimes it doesn't.

15          You know, in Stanford, they're looking at a situation

16  where the trustee in that case -- by the way, it's not

17  proceeding on an avoidance action, Mr. Mungovan, and I'm not

18  saying this in a negative way --

19          MR. MUNGOVAN:  It's a receivership proceeding, I

20  understand.

21          MR. KAUFMAN:  Well, no, it's not only that, but it's

22  not on an avoidance theory.  There's a theory under the SEC law

23  that they can proceed to basically disallow unjustified gains,

24  and so it's not premised on a fraudulent conveyance because

25  Stanford is a debt case and what's happened in that case is,

**J&J COURT TRANSCRIBERS, INC.**

113

1  the SEC has taken the position -- again, I know you're not

2  bound by any of this -- taken the position that at least in

3  that kind of case, we don't think it's cognizable that you

4  ought to go against innocent creditors who invested.  Well,

5  that's fine.  The SEC has not taken a position with regard to

6  the equity cases or the distinction between the two and, even

7  if it does, it's up to the courts, not the SEC, to make policy

8  on this issue because it's a judicial issue of whether or not

9  those are distinctions, one from another, that are merited.

10          It is to say that some cases -- sometimes the

11  windshield wins and sometimes the bug wins and whatever --

12  whoever sang that and I screwed that up.  What is that?

13          THE COURT:  I can't help you out.

14          MR. KAUFMAN:  Can anybody help me there?  Sometimes

15  you're the windshield, sometimes you're the bug.

16          THE COURT:  Something like that.

17          MR. KAUFMAN:  Well, you know, in this situation, Your

18  Honor, the result is that the documents govern the outcome and

19  the outcome is one that is not unfair and it ought to be

20  followed because otherwise you compromise the entire

21  distinction between debt and equity and undermine other

22  principles in the Bankruptcy Code.

23          Thank you for the Court's indulgence.  I appreciate

24  it.

25          THE COURT:  Thank you.  Mr. Mungovan?

**J&J COURT TRANSCRIBERS, INC.**

114

1          MR. MUNGOVAN:  Just very, very briefly, Your Honor.

2   Two very quick points.  First, I don't want to beat a dead

3   horse on the Ebby case, but if you look at the case itself, on

4   the first page of the case, what the manager -- we'll call it

5   the manager because that's what they call it today -- the

6   fraudster was investing in the New York Stock Exchange

7   Securities.  That's a far cry from a debt in a bond type case

8   which I think that the trustee's counsel really wants to

9   characterize it into.

10          The asset manager is investing money.  There's risk

11   of loss of principle as a result of that investment behavior.

12   There's no guaranteed return on the investment.  Ebby is not a

13   classic debt case in the sense of a bond or a promissory note.

14   Ebby looks like an equity case.  It looks like this case.

15          The second point, and very briefly, Your Honor, I

16   think --

17          THE COURT:  Truth be told, I really don't address

18   this issue.

19          MR. MUNGOVAN:  I would agree.

20          THE COURT:  Truth be told, nobody except maybe AFI

21   Holdings really addresses the issue in this case.

22          MR. MUNGOVAN:  I would agree, Your Honor.

23          THE COURT:  And truth be told, AFI Holdings really,

24   as I think Mr. Kaufman accurately points out, it really doesn't

25   address it.  It just says, this is the way it is.

1          MR. MUNGOVAN:  The key issue, Your Honor, is, it's a

2    limited partnership.  It's just like this case.  <u>Bayou</u> is a

3    limited partnership.

4          THE COURT:  No, I'm saying -- I understand and I

5    think Mr. Kaufman acknowledges if <u>AFI Holdings</u> was a decision

6    of the United States Court of Appeals for the Eleventh Circuit,

7    we would not be having this discussion.

8          MR. MUNGOVAN:  I understand, Your Honor.

9          THE COURT:  Or I wouldn't have to worry about it

10   anyway, because it would be very easy for me to say --

11         MR. KAUFMAN:  Move it on up.

12         THE COURT:  -- take it on up because you're going to

13   have to apply for cert.

14         MR. MUNGOVAN:  I understand, Your Honor.

15         THE COURT:  Okay.  I think Mr. Kaufman has

16   acknowledged that, so there's no real disagreement about that.

17         MR. MUNGOVAN:  I'll move on, Your Honor.  Last point.

18         THE COURT:  No.  I don't mean to cut you off or bring

19   you up short, but I just want to make sure I've got a -- that I

20   really understand these cases because I don't think -- as I

21   understand this dispute and the argument that you all are

22   making, these cases, the cases -- if you look at the cases on

23   their face, facially, all of them support the position of the

24   defendant, every one of them.

25         MR. MUNGOVAN:  I would agree, Your Honor.

1          THE COURT:  They all -- and I think Mr. Kaufman would

2    agree with that, except _Terry_ which doesn't -- which is not a

3    Ponzi scheme case.

4          MR. MUNGOVAN:  Correct.

5          THE COURT:  So, they all support the position of the

6    defendants.  I think the trustee's position is, the only one

7    that is a square holding is _AFI Holdings_.  And I think he's

8    right about that.  I'm not sure.

9          MR. MUNGOVAN:  I wouldn't necessarily agree with

10   that.

11         THE COURT:  The _United Energy_ case is -- is that the

12   one with the power modules?

13         MR. MUNGOVAN:  Yes, Your Honor.

14         THE COURT:  The _United Energy_ case is close to

15   _Holdings_ because it was not a note obligation.  It was some

16   other kind of obligation.  They kind of put all that one

17   together.

18         MR. MUNGOVAN:  Correct.

19         THE COURT:  So, that was sort of an investment.  So,

20   maybe that's sort of an equity and right this minute I can't

21   remember -- the other one was the _Independent Clearing House_

22   case, right?

23         MR. KAUFMAN:  That's a debt case.

24         THE COURT:  Well, we all agree that's a debt case?

25         MR. KAUFMAN:  When I read to Your Honor -- I don't

**J&J COURT TRANSCRIBERS, INC.**

1  mean to interrupt.

2          MR. MUNGOVAN:  I don't believe so, Your Honor, but I

3  think from the point of view from the defrauded investors

4  group, the equity versus debt distinction is meaningless.  The

5  courts haven't looked at it.  They haven't decided it.

6          THE COURT:  Why should -- presumably, as I understand

7  it, you're a bankruptcy expert, right?

8          MR. MUNGOVAN:  No, I'm not, Your Honor.

9          THE COURT:  Oh, you're not?

10          MR. MUNGOVAN:  I'm learning.  Let's put it that way.

11          THE COURT:  Oh, I thought you were a bankruptcy guy.

12          MR. MUNGOVAN:  I'm a business litigator, a securities

13  litigator.  I litigate blown hedge funds for the most part.

14          THE COURT:  Okay.  Well, then, in any event, I think

15  most bankruptcy lawyers would agree with me that if I have

16  stock in a corporation and I get my stock back when the

17  corporation is insolvent, that's a no-no.  That just doesn't

18  happen.

19          MR. MUNGOVAN:  I agree, Your Honor.

20          THE COURT:  That's a fraudulent conveyance.

21          MR. MUNGOVAN:  I agree, Your Honor.

22          THE COURT:  Okay.  So, why doesn't that rule apply

23  here?

24          MR. MUNGOVAN:  It doesn't apply here, Your Honor,

25  because in this context, the investors were defrauded at the

1  time that they made their investment.

2          THE COURT:  Why does that make a difference?

3          MR. MUNGOVAN:  Of course it makes a difference.

4          THE COURT:  Why?

5          MR. MUNGOVAN:  Because the issue is, a claim arises

6  and the way that the Bankruptcy Code looks at a claim and

7  defines value --

8          THE COURT:  I understand.  I understand all that

9  argument and I'm asking the policy question.  Why should it

10  make any difference?  Why does it make any difference?

11          MR. MUNGOVAN:  The issue of why an investor who

12  invested in a Ponzi scheme that was a fraud from the beginning

13  should be treated differently?

14          THE COURT:  Why somebody who makes an equity

15  investment gets treated the same as somebody who makes a debt

16  investment?  Why do the normal corporate equity entity -- maybe

17  there's a dispute about whether the same principles apply to an

18  LLC or an LLP, but why do the normal principles that preclude

19  withdrawal of capital from an insolvent entity not apply?

20  That's the -- the trustee raises the issue that the normal

21  rules applicable to withdrawal of capital or return of capital

22  from an insolvent entity should apply here, I think.  Right?

23          MR. KAUFMAN:  Correct, Your Honor.

24          THE COURT:  If you boil it all down, that's what it

25  boils down to.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. MUNGOVAN:  Right.  And where there's an insolvent

2     entity, where there's a shareholder, and as you pointed out the

3     example is the shareholder takes cash out on a dividend basis,

4     the distinction here is that --

5          THE COURT:  Or return of capital.

6          MR. MUNGOVAN:  Return of capital, whatever it is.

7     The distinction here is that there's a corollary claim that

8     these investors have in Ponzi scheme cases, okay, that offsets

9     that other claim.

10          THE COURT:  But, why does that trump the rule --

11          MR. MUNGOVAN:  Because this is --

12          THE COURT:  <u>Terry</u>, presumably, tells us that the

13     fraud rule doesn't trump the withdrawal of capital rule.

14          MR. MUNGOVAN:  Because in this context, Your Honor,

15     the way that Congress wrote 548(c) and defined "value" and

16     defined "debt", they created this opportunity for a defrauded

17     investor who might be equity or debt, it doesn't matter from

18     our view, but in the context of an equity investor, that

19     investor, because they were defrauded ab initio, from the

20     beginning, they should be treated differently than an investor

21     who made an investment and had a market loss.

22          THE COURT:  Well, why isn't the defrauded investor in

23     <u>Terry</u> treated differently?

24          MR. MUNGOVAN:  Because the <u>Terry</u> investor did not

25     invest in a fraud scheme that, at the time that invested, they

**J&J COURT TRANSCRIBERS, INC.**

120

1  took a loss immediately.  That's the key distinction.

2        THE COURT:  Well, how could they have a restitution

3  claim?  If they invested properly, there's no fraud in the

4  investment.  They got stock.

5        MR. MUNGOVAN:  Right.

6        THE COURT:  The fact that they later got defrauded

7  doesn't change -- that doesn't -- that gives them a later --

8        MR. MUNGOVAN:  I don't know that they got defrauded

9  in Terry, Your Honor.  The issue in Terry, I submit, and I

10  could read it again and brief it further, but the issue in

11  Terry is, they went after the shareholders who received a

12  dividend in excess of their investment.  It had nothing to do

13  with the return of capital.  It was a dividend payment.

14        THE COURT:  So?

15        MR. MUNGOVAN:  And so the distinction --

16        THE COURT:  Isn't it the same rule?

17        MR. MUNGOVAN:  No, Your Honor.

18        THE COURT:  I mean, if you can't get a dividend, can

19  you get --

20        MR. MUNGOVAN:  Because the issue in that case, Your

21  Honor, is there's no offsetting basis to say, as here, I have a

22  claim that I'm setting off against.

23        THE COURT:  Why not?  Why would the Court talk about

24  a restitution claim unless they asserted one?

25        MR. MUNGOVAN:  I have to read it again, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

121

1  to be honest with you.  I'm happy to brief it further.  I think

2  the key distinction though here, unlike in the Terry case, is

3  we have a fraud claim from the beginning.  I'll have to look at

4  the restitution aspect of the Terry case and I'm happy to

5  submit a brief on it, a very short one.

6          The other point I want to make very briefly, Your

7  Honor, and I appreciate your indulgence, is that the trustee's

8  counsel talks about this -- I hate to use it -- the presto

9  chango, the conversion from an equity to a debt interest.

10          THE COURT:  It's not quite as elegant as his other

11  terms, is it?

12          MR. MUNGOVAN:  Right.

13          THE COURT:  Give it a little time.  He'll come up

14  with --

15          MR. MUNGOVAN:   The transmutation.

16          THE COURT:  By the time you'll all get up to the

17  Eleventh Circuit, he'll have a fancy term for it.

18          MR. MUNGOVAN:  I have no doubt, Your Honor.  Here's

19  the point that I want to make it about it.

20          THE COURT:  Maybe the transfiguration would be --

21          MR. MUNGOVAN:  How about trans-substantiation, Your

22  Honor?

23          THE COURT:  Or trans-substantiation.

24          MR. KAUFMAN:  How about trans -- what's that word?

25  Trans?

**J&J COURT TRANSCRIBERS, INC.**

122

1          THE COURT:  Transmogrification or something?

2          MR. KAUFMAN:  Yeah, that one.

3          THE COURT:  I'm sure he'll have --

4          MR. KAUFMAN:  I can't pronounce it.

5          THE COURT:  I'm sure he'll have something that he'll

6     develop as the term to describe that concept.

7          MR. MUNGOVAN:  No doubt.  The point that I want to

8     make, Your Honor, is that there isn't a changing of the

9     interest.  There's a separate claim that arises.  They still

10    hold the equity interest.  The example is if they invested a

11    million dollars, and at the time they invested the million

12    dollars into the Ponzi scheme, rather than having it go to

13    zero, it's worth $500,000.  Their net equity is $500,000.  They

14    have a corollary claim for $500,000 for rescissionary damages

15    because they're still holding, under Mr. Kaufman's view, an

16    equity interest for the $500,000 that was not lost.  They sit

17    side-by-side.  It's not changing one into the other.  That's

18    the view of the defrauded investor defendants, Your Honor.

19          Again, thank you for your time.  We appreciate if

20    very much.

21          THE COURT:  You're welcome.  Thank you.  Does anyone

22    else wish to be heard?  Ms. Steinfeld?

23          MS. STEINFELD:  Good afternoon, Your Honor.  I was

24    going to sit quietly, but I'm a lawyer, Your Honor.  Let me

25    introduce myself.  In the terms of this case, I represent the

**J&J COURT TRANSCRIBERS, INC.**

1  Withers.  Ms. Withers is a living defendant; Mr. Withers is a

2  deceased defendant.  And, right now, the situation of my

3  adversary is it's currently in default.  I would move to set

4  aside the default and we're trying to settle the adversary and

5  I haven't filed anything vis-a-vis the motion for summary

6  judgment.  I've been monitoring today and I just wanted to make

7  a couple of comments vis-a-vis the summary judgment motion.

8          I, too, as Mr. Phillips' and most lawyers' concern,

9  that should my default -- you know, I'm anticipating we'll

10  either settle or we'll get set aside and we'll be defending and

11  I don't want today's ruling, as the Court has said, you know,

12  I'll be able to raise my defenses.  I want my defendant who is

13  currently an unemployed schoolteacher in Oregon to be able to

14  claim her value of the money that she put into the investment.

15          I just want to raise the issue that my schoolteacher

16  who was investing with the principal of IMA, she's an investor

17  who wasn't aware whether she was doing debt or equity.  She was

18  just going through an investment advisor and making investments

19  and I wanted to just put that out on the table as, you know,

20  amongst all these defendants in all these hundreds or 150

21  adversary proceedings, that she wasn't aware or cognizant of

22  whether this was debt, equity, what it was she was doing.  Her

23  investor -- investment advisor, said, do X, and she did X, and

24  she said he said --

25          THE COURT:  Why would that make a difference?

**J&J COURT TRANSCRIBERS, INC.**

124

1              MS. STEINFELD:  You know --

2              THE COURT:  Are you saying if somebody invests -- had

3   the good fortune to invest a lot of money in General Motors in

4   1950 could say -- well, I guess, now that wouldn't make much

5   difference, would it?

6              MS. STEINFELD:  You know, I'm just -- you're saying

7   debt versus equity versus trying to make this distinction,

8   limited partnership agreements.  I don't think -- she hasn't

9   sent me a signed agreement.  I don't think she has a signed

10  agreement.  She --

11             THE COURT:  May not, but the point is that may be

12  important if there's no written agreement.

13             MS. STEINFELD:  Correct.  I just --

14             THE COURT:  If there's a written agreement, somebody

15  becomes a shareholder --

16             MS. STEINFELD:  But, it's not the situation like most

17  fraudulent transfers where you've got these partners and the

18  partners are controlling things and you've got partners who are

19  doing things and they have all this knowledge and they're

20  taking things out.  So, I just wanted to throw that out on the

21  table.

22             THE COURT:  Okay.  I understand.

23             MS. STEINFELD:  As I say, I'm new to the case, Your

24  Honor, and I just wanted to put that out there.  Okay?

25             THE COURT:  Okay.


                    **J&J COURT TRANSCRIBERS, INC.**

125

1          MS. STEINFELD:  So -- and then also it strikes me,

2    and I also, you know, said I'm new and I'm just commenting at

3    this point, that most of the creditors at this point, a

4    creditor being either investor, or tortfeasor or however you

5    want to define it, that the vast majority of them are going to

6    be either unpaid claimants or paid claimants and that there may

7    very well be a solvency issue at some point in that there's a

8    huge group of investors that, if the trustee wins on this

9    argument, that then it may be a solvent estate and I thought I

10   read a brief on this point and that hadn't come up today and I

11   just wanted to reiterate that point.

12          THE COURT:  Okay.

13          MS. STEINFELD:  My points.  Thank you, Your Honor.

14          THE COURT:  Well, I think that goes back to the

15   presto chango argument.

16          MS. STEINFELD:  Correct.

17          MR. KAUFMAN:  Well, let's put it this way.  From her

18   lips to our ears.  If we ever recovered enough to make this

19   estate solvent --

20          THE COURT:  You'd be a hero.

21          MR. KAUFMAN:  -- we have a lot more claims out there

22   than I think we have because, as best I can tell, it's about

23   $20 million and that's unfortunately chasing about 80 or $70

24   million worth of claims.  So, I think the solvency issue, not

25   in our lifetime in this case, but understood.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Go ahead.

2          MR. STEIN:  Your Honor, I hadn't planned on speaking

3  today, but again --

4          THE COURT:  It's not necessary that anybody speak.

5          MR. STEIN:  As keeping with the theme.  I just want

6  to take a crack at that question you had asked and hopefully I

7  don't fail miserably.

8          COURT CLERK:  Could you remind me of your name?

9          MR. STEIN:  Sure.  I'm Kevin Stein.  I represent Dr.

10  Eric Randolph and Laverne Hamilton Jones.

11          The question you posed about <u>Terry</u> and dividends and

12  why a dividend would be different than a return of capital,

13  simply put, a dividend is much more like fictitious profit.  It

14  is a type of a distribution of a profit, as opposed to return

15  of principle.

16          THE COURT:  True, but you can't return capital in an

17  insolvent entity before you pay your creditors, can you?

18          MR. STEIN:  Well, that kind of dovetails into --

19          THE COURT:  If you're a director, don't you get to

20  pay that back?

21          MR. STEIN:  If you're a director?

22          THE COURT:  If you authorize that?  If you're a

23  director of a corporation and you permit a redemption of stock

24  when the corporate is insolvent, doesn't the corporate code of

25  just about every state prohibit that?

**J&J COURT TRANSCRIBERS, INC.**

127

1          MR. STEIN:  The corporate code would allow the other

2    stockholders, or potentially a creditor, to unwind the

3    distributions, but I'm not aware -- whether there's a breach of

4    fiduciary duty against the director, we're going down a

5    different road.  But, I'll point out one other --

6          THE COURT:  Well, the point is, it's a recoverable

7    transfer, isn't it?  Somebody can recover that transfer.

8          MR. STEIN:  If a dividend is made from an insolvent

9    corporation --

10          THE COURT:  No.  Let's assume there's a corporation

11    that has a thousand shareholders.  Each of them has one share,

12    and the assets of the corporation are $100.  And so the

13    management says, well, we like these hundred shareholders.

14    We're going to give them $100 to redeem their shares.  What do

15    the other 900 shareholders do?

16          MR. STEIN:  The other shareholders have a right to

17    unwind those distributions.

18          THE COURT:  So, that everybody gets ten percent?

19          MR. STEIN:  Correct.

20          THE COURT:  Why shouldn't that apply here?  That's my

21    question.

22          MR. STEIN:  Because of the fraud.

23          THE COURT:  Why does the fraud make any difference?

24    Everybody's been defrauded.

25          MR. STEIN:  Well, we've been talking about

**J&J COURT TRANSCRIBERS, INC.**

128

1  restitution, but let's also just briefly mention recission.

2  Okay?

3            THE COURT:  What's the difference?

4            MR. STEIN:  Under Georgia's Blue Sky Laws, the Blue

5  Sky Laws, if you're defrauded investing in security, whether

6  it's a note --

7            THE COURT:  Right.

8            MR. STEIN:  -- or an equity --

9            THE COURT:  Okay.

10           MR. STEIN:  -- it's a security --

11           THE COURT:  Right.

12           MR. STEIN:  -- under Blue Sky Law, or under state

13 contractual law, simple fraud, the inducement theory, under

14 either scenario, you have a right of recission.

15           THE COURT:  Okay.

16           MR. STEIN:  What's the remedy for recission?  Give me

17 back what I gave you, dollar-for-dollar.

18           THE COURT:  Right.  So, tell me why some people

19 should get all their money back and others shouldn't.

20           MR. STEIN:  That's the way it works.

21           THE COURT:  That's the way it is.

22           MR. STEIN:  Absolutely.

23           THE COURT:  Too bad.

24           MR. STEIN:  It's just like the 90-day preference

25 rule.

**J&J COURT TRANSCRIBERS, INC.**

129

1          THE COURT:  Too bad.  See Ebby.

2          MR. STEIN:  Why do we say that a creditor who

3  receives a payment on an antecedent debt on the 91st day before

4  bankruptcy keeps it and the one on the 89th day doesn't keep

5  it?  It's just that's the way the line was drawn.

6          THE COURT:  Okay.

7          MR. STEIN:  Thank you.

8          THE COURT:  Anyone else want to be heard?

9          MS. PASSYN:  I'm sorry.  Just one more point on that.

10          Also, there's a difference between denying a claim

11  and saying that you're not allowed to be paid out of the estate

12  and then allowing the estate to go into other people's pockets

13  and get money back.  And that, just like the 90-day preference,

14  there's just policy difference on both of those.  But, I want

15  to go back to the point --

16          THE COURT:  What's the policy difference?  Where do I

17  find that policy difference?

18          MS. PASSYN:  Well, in 510(c).  That's why they put

19  equity holders behind, because there's a difference between

20  allowing people -- allowing the -- forcing the estate to pay

21  people that are equity holders and then, on the other end,

22  allowing the estate to go into their pockets and bring them

23  back, to sue them and then go into their pockets and say, now

24  you've got to pay us back and we brought these claims.

25          THE COURT:  But, the question is, why not?

**J&J COURT TRANSCRIBERS, INC.**

1        MS. PASSYN:  Because it's not that --

2        THE COURT:  Because they happen to get paid first?

3   I mean, that's the basic question and, in fact, _Ebby_ raises

4   that question.

5        MS. PASSYN:  Well, I want to --

6        THE COURT:  They kind of say, it's not before us.

7        MS. PASSYN:  I just want to raise one issue that --

8        THE COURT:  Hold on.

9        MS. PASSYN:  Sorry.

10       THE COURT:  Don't try to dodge my question.

11                      (Laughter)

12       MR. KAUFMAN:  That's why I'm not getting up again.

13       THE COURT:  Maybe, Mr. Stein --

14       MR. STEIN:  Yes, Your Honor.

15       THE COURT:  Mr. Stein just -- he had the answer.

16  That's the way it is.

17       MS. PASSYN:  That's the way it is.

18       THE COURT:  That may be the answer.

19       UNIDENTIFIED SPEAKER:  To quote Bruce Hornsby.

20       THE COURT:  But, _Ebby_ says it may be that exact

21  equitable equality among the victims of Young could be only

22  attained only in an equitable proceeding under which all of

23  Young's customers would be charged with all payments made to

24  them and such contribution among them required as would be

25  necessary to give each victim the same percent of the money

                **J&J COURT TRANSCRIBERS, INC.**

131

1  paid in.  That's what <u>Ebby</u> said right before saying, but that

2  point is not before us.  Maybe the trustee has found a way to

3  make that happen.

4          MS. PASSYN:  Well, Your Honor, one thing the trustee

5  has not done is explain to me exactly why these claims that he

6  acknowledges that we have relate back, for his purposes, to the

7  time of the transfer, yet they do not relate back for the

8  defrauded investors' purposes, and that's just the one point

9  that I wanted to make.

10          THE COURT:  That is a little flaw in the slaw. for

11  him, isn't it?  Maybe it's just because that's the way it is.

12          MR. KAUFMAN:  The only other comment I would make

13  about the way it is, is the 90-day preference period applies to

14  the issue of claims and it basically sets up a statutory

15  structure.  There is nothing in the Code that sets up any

16  statutory structure with regard to the type of circumstance

17  here.  So, while it may just be the way it is, that somebody

18  drew a line and said, I'm going to look back so far, other than

19  that, creditors can get paid in advance and that's the whole

20  proposition.  The whole proposition is, creditors have from 500

21  years of legal jurisprudence entirely different rights.  They

22  have rights.  They have obligations owed to them.  It's the

23  nature of contract as opposed to people who are equity

24  investors who hold interests.  And that fundamental distinction

25  can't be just whittled away and that's the essence of this

1  argument.  And the fact that you can somehow constrain for a

2  90-day preference period to avoid craziness of a run on an

3  institution to say, I'm not going to let even all creditors get

4  paid, does nothing to suggest that equity distinctions ought to

5  be ripped asunder and rendered meaningless, which obviously the

6  thrust of their argument would create.  Thank you.

7          THE COURT:  Mr. Mungovan, if -- suppose the trustee

8  recaptured his claims to -- suit to recover improper returns of

9  capital.

10         MR. MUNGOVAN:  I'm not sure I understood Your Honor.

11  Could you state it again?

12         THE COURT:  Well, instead of having a fraudulent

13  transfer theory, what if he had an improper return of capital?

14  That's not his theory, but how would that change the result?

15         MR. MUNGOVAN:  What would be the theory of the

16  improper return of capital?  What's the legal --

17         THE COURT:  The limited partnership returned capital

18  to the partners while it was insolvent.

19         MR. MUNGOVAN:  Under the limited partnership

20  agreement it says that the limited partner has the right to

21  withdraw according to the amount that's in the capital account.

22  And the capital account was calculated by the manager of the

23  limited partnership.  The investor had no knowledge that the

24  capital account was fraudulently inflated.  So, what I would

25  suggest is that there's no such claim in this case for an

J&J COURT TRANSCRIBERS, INC.

1  improper distribution of capital to a redeeming investor.

2  Under the contract, the investor has the right to withdraw his

3  capital.  And if you look in the limited partnership agreements

4  and the LLC agreements that are attached to the trustee's

5  affidavit, it's quite clear that the right to withdraw is

6  express in the contract.

7          MR. KAUFMAN:  Just one --

8          THE COURT:  Mr. Kaufman.

9          MR. KAUFMAN:  The right to withdraw is only that

10  which you're owed and it can't -- and the fact that you think

11  you're owed X, if it's belied by the fact that you're only

12  really, when all is said and done, owed one percent of X,

13  you're entitled to withdraw that.  I mean, the fact that, for

14  example, in the Ebby case, the case that Mr. Mungovan says is

15  startling or eerily -- I think was your word -- like this case.

16  The difference is, that case wasn't one where people signed

17  equity membership interests.  It was one that had no indicia of

18  limited partnership, partnership, shareholder interests

19  whatsoever.  It didn't have those indicia.  This clearly has.

20  And so --

21          THE COURT:  Well, interestingly, it does have

22  indicia.  I mean, 1926 -- 24, was possibly a long time before a

23  lot of --

24          MR. KAUFMAN:  Just before I started.

25          THE COURT:  Just before you started.  But, is it

**J&J COURT TRANSCRIBERS, INC.**

134

1  debt, is it equity, all those kind of arguments seem to start

2  beginning in --

3        MR. KAUFMAN:  All I'm saying is --

4        THE COURT:  Well, hold on.  The idea that you're

5  going to get this beginning earnings and profits -- where does

6  it say that?

7        MR. KAUFMAN:  You can still get that in a debt case,

8  Your Honor.  It's just all a question --

9        THE COURT:  You're supposed to be buying and selling

10  securities.  I mean, you all both accurately describe the case.

11  You just emphasize different parts of it, obviously.

12        MR. MUNGOVAN:  Your Honor, the key word is it's a

13  pool.

14        THE COURT:  Yes.

15        MR. MUNGOVAN:  It's a pooled investment and that's

16  what a limited partnership -- that's how these funds work.

17  They're pooled, undifferentiated interests.  They put their

18  money in and all of the money is pooled and invested by the

19  manager.  That's how a hedge fund works.  That's how these

20  documents were drawn up by Seward and Kissel.  Okay.  That's

21  what a pooled investment is.

22        MR. KAUFMAN:  Except that in this case there were

23  equity subscription agreements and documents signed saying that

24  they were members and they were subordinated to creditors and

25  they are not concomitant things, at least in the Ebby v.

1   Ashley.  Clearly, Mr. Mungovan is right to the extent that

2   there are elements of it that looks like it's a pool

3   investment.  They're doing the same kind of thing.  But, the

4   distinction is -- and, listen, we can only put so much weight

5   on Ebby because, frankly, when Ebby is all said and done, it

6   doesn't get to the issue other than acknowledging that there

7   was a claim.  It doesn't really reach our issue of so what do

8   you do to the extent there is --

9           THE COURT:  Well, this was only for the profits,

10  right?  The excess money, right?

11          MR. KAUFMAN:  Yes.  That's all it was.  But, I'm

12  saying --

13          THE COURT:  So, it's all dicta anyway.

14          MR. KAUFMAN:  It's all dicta anyway, but --

15          MR. MUNGOVAN:  I don't agree.  You can't get to the

16  excess profit and have to return the profit without

17  understanding and acknowledging that you don't have to return

18  the principal.  They're conjoined together so it's --

19  respectfully, Your Honor, it's not --

20          THE COURT:  The trustee wasn't trying to get the

21  principal back.

22          MR. MUNGOVAN:  But, the Court doesn't -- Your Honor,

23  the point is, whether the trustee is trying to get it back or

24  not, in order to decide the profit has to go back, the Court

25  would have to decide also that it's not appropriate to

**J&J COURT TRANSCRIBERS, INC.**

1  recapture principal.

2         MR. KAUFMAN:  I think one thing could be said about

3  Ebby and that is, if anybody wants to make some case being

4  seminal that's answering all these questions, it leaves a lot

5  more murky, by anybody's examination, a lot more murky than it

6  solves.  It doesn't address a host of the issues we're raising

7  here.  Whether it's dicta, whether it's passing, whether it has

8  some effect, it was the start of all of this and that's why

9  it's interesting.  But, beyond that, I think it's relegated to

10 the fact that it's basically one line of jurisprudence that

11 you've got to look at in its context.

12        Really, at the end of the analysis claims squared or

13 not claims squared, what's the difference between this case and

14 any other equity distribution case and can articulation --

15 without articulation, can you use that as the means to get

16 around the for-value?

17        THE COURT:  Okay.  Anybody else?

18        MR. MUNGOVAN:  Unless you have any other questions,

19 Your Honor, thank you.

20        THE COURT:  If I quit talking, maybe you all will.

21                     (Laughter)

22        THE COURT:  Why don't we take a short break and then

23 I'll come back and we'll see where we are.  Let's take about a

24 ten-minute break.

25        MR. KAUFMAN:  Thank you, Your Honor.


                    **J&J COURT TRANSCRIBERS, INC.**

1                          (Recess)

2              THE CLERK:  Okay.  We're back on the record.

3              THE COURT:  All right.  I have read all of the briefs

4    and I have looked at most of the cases.  I have studied this

5    issue.  I'm not ready to rule today.

6              I don't think I have anything to add to the

7    arguments, so I do not intend to write the next -- I don't

8    intend to write the definitive order on this issue.  So, when I

9    issue an order, which I hope will be promptly, it will be

10   short.  I don't intend to try to parse through all of the

11   issues step-by-step.  It will probably just be either -- the

12   presto chango theory looks pretty good to me, or the consensus

13   view works.

14             In that regard, I want to thank the lawyers,

15   particularly in this case, because the briefing and the oral

16   advocacy has been outstanding, in my judgment, and it's a treat

17   to have that.  I thought the briefs, in particular, on both

18   sides fairly, accurately, reflected what was in the cases.  I

19   know we all disagree about what they say and what the import of

20   them is, but I thought that there was -- for the most part, you

21   all focused on the relevant cases, the relevant authorities,

22   the relevant points in the cases, and by the time I had read

23   the briefs, I had -- without reading the cases, I had a clear

24   understanding of what the issues were and what the positions of

25   the parties were.  And so I very much appreciate that and I

                    **J&J COURT TRANSCRIBERS, INC.**

1  appreciate the trustee on his side, or maybe this was a joint

2  effort and, if so, I commend the joint defense group and others

3  who participated.

4      But, the idea of getting all of this teed up in one

5  proceeding, I also think was a very good idea and was at least

6  very helpful and made it easier for me.  So, I appreciate that,

7  as well, and I do think all of the parties have been very

8  helpful in that regard and I do appreciate it.

9      I want to point out, because it's been said, and I

10  think it was part of advocacy, and the trustee's position has

11  been criticized and I've, perhaps, had a little fun with it

12  myself, but I think the trustee's position, contrary to Mr.

13  Mungovan's advocacy position, is not fundamentally illogical.

14  I think it is a well thought out position.  I think it is a

15  possibly persuasive position.  I'm not saying I -- I have not

16  decided that I agree with it.  Don't anybody get all excited

17  and happy on this side or disappointed on this side.  I do not

18  by that statement to make any observation, other than I do not

19  think it is an argument that can be addressed out of hand.  I

20  do not think it is an argument that any of the cases have

21  definitively and appropriately addressed.  I don't think it's

22  been -- other than maybe in the AFI Holdings case.  The other

23  cases don't seem to really focus on this particular issue.

24  They say things that support the defendant's position to be

25  sure and they therefore indicate that that is, in fact, the

1    consensus view, which it certainly appears to be.

2          So, anyway -- and I did -- Mr. Kaufman, I did think

3    your -- notwithstanding Mr. Mungovan's quivels with it -- I

4    thought your terminology, although not accurately descriptive

5    of what the law is, I thought that the terminology accurately

6    described the concepts that you were arguing and advocating in

7    an appropriate way.  So, the theory is articulate and we'll

8    find out whether the law supports it.

9          I wanted to go over to make sure that I include

10   everything in the order that this does not cover.  It does not

11   cover good faith.  It does not cover any statute of limitations

12   problems.  I'm assuming the existence of a Ponzi scheme, but

13   I'm not deciding that issue.  And is there anything else that I

14   need to -- and anything else that I said we're not covering and

15   I'm not deciding, and I'm still not deciding, but is there

16   anything --

17         MR. KAUFMAN:  Whether any particular investor is

18   equity; Mr. Phillips' point.

19         THE COURT:  Okay.  Thank you.  Whether any investor

20   is equity.  Okay.  Anything else I need to include?  Yes, sir?

21         MR. BERNARDINO:  Your Honor, the corollary would be

22   whether any particular investor had a claim.

23         THE COURT:  Okay.  Anything else?

24         MR. MUNGOVAN:  One issue, Your Honor.  I have not

25   spoken about it with Mr. Kaufman, but I believe that we had an

**J&J COURT TRANSCRIBERS, INC.**

140

1 agreement that after the decision was rendered that we would

2 stay the proceedings --

3          THE COURT:  We'll come back to that.

4          MR. MUNGOVAN:  -- one way or the other.

5          THE COURT:  Let me -- I'll come back to that.

6          MR. MUNGOVAN:  Okay.  Thank you, Your Honor.

7          THE COURT:  Because we're talking about wanting to do

8 an immediate appeal or something, or an interlocutory appeal,

9 so I want --

10          MR. MUNGOVAN:  Correct.

11          THE COURT:  We'll talk about both of those issues.

12 Anything else I need to exclude from the --

13          MR. KAUFMAN:  Profit.  Profit.

14          THE COURT:  Whether excess profits are recovered.

15          MR. KAUFMAN:  Yeah, except, you know, as Your Honor

16 indicated, if we were to prevail, then profit would be gone.

17 If we lose, then the issue of profit would come back on a

18 separate document.

19          MR. MUNGOVAN:  We agree, Your Honor.

20          THE COURT:  Okay.  Anything else?

21          MR. PHILLIPS:  Your Honor, I think solvency -- all

22 that stuff, the 548, the actual fraud and constructive fraud,

23 was one of the elements of solvency, but I think that's tied up

24 in the Ponzi scheme.  I think that's what they would say, that

25 it's a Ponzi scheme that brings the insolvency.

**J&J COURT TRANSCRIBERS, INC.**

141

1          THE COURT:  Would it be -- it would be helpful to me

2     if you all could do it.  Could you all put together a proposed

3     part of an order which would say what this order does not cover

4     and just submit that to me?  So, I mean, I think I understand

5     what --

6          MR. KAUFMAN:  Well, why don't we make a stab and then

7     we'll circulate it.  If others will give Mr. Bates and Mr.

8     Mungovan their cards, if they want to be heard about that

9     matter, we'll circulate it to them.

10         MR. MUNGOVAN:  We have a joint defense group, Your

11    Honor, so --

12         THE COURT:  Okay.

13         MR. MUNGOVAN:  -- we can be the point of entry for

14    the investor/defendant side, and Mr. Kaufman and I can work

15    together or our firms can do it.

16         MR. KAUFMAN:  Actually, Mr. Bates.  I'm going to be

17    out of town in the next week, but we'll --

18         THE COURT:  If you'll just send me a paragraph or

19    two.

20         MR. KAUFMAN:  Right.  We understand.

21         THE COURT:  Send it to chambers by WordPerfect, Word.

22    Then I can incorporate it in an order.  It doesn't need to have

23    a caption or anything else on it.

24         MR. KAUFMAN:  We understand.

25         THE COURT:  That will be helpful to me.  Okay.  I've

**J&J COURT TRANSCRIBERS, INC.**

142

1   already ruled on the claim preclusion issue, so you all know

2   that.  As I said, I do not intend to get any further into the

3   -- I don't intend to write the next definitive opinion on this,

4   or the first definitive opinion, for that matter, because I

5   think the arguments are well stated in the briefs and I really

6   -- it fundamentally comes down to, I guess, a determination of

7   whether the rule relating to equity distributions trumps the

8   rule in Ponzi scheme cases and whether fraud should make a

9   difference in the application of those equity rules.  And

10  that's what the analysis involves, I think.  But, in any event,

11  I will deal with that in a written order that will be short.

12          Now, I'm hopeful of getting this done fairly quickly

13  so, when it gets done, where -- do you all want to go to the

14  Eleventh Circuit?

15          MR. KAUFMAN:  I think that was the consensus.

16          THE COURT:  Is that the idea?

17          MR. MUNGOVAN:  Yes, Your Honor.

18          THE COURT:  Okay.  How do we make that happen?

19          MR. KAUFMAN:  I think there's a procedure for you to

20  designate that as appropriate for immediate review in the aid

21  of the parties.  I don't remember the Code section.  Maybe Mr.

22  Bernardino or somebody else has that.

23          THE COURT:  Can I do that in this order, or do I do

24  that at some later point?

25          MR. KAUFMAN:  I think we're prepared.  I don't think

1   there's any real reason.  Whichever way it comes out, there's

2   going to be an interlocutory appeal desired by either side.

3   So, perhaps what we ought to do, if this is not presumptuous,

4   is, we'll get with Mr. Mungovan and we'll find the requisite

5   appropriate language and we'll suggest that to you.  Obviously,

6   you can choose to modify it as you wish, but we'll have the

7   requisite authority in there and report the magic language that

8   will maximize getting there.  That doesn't mean that they have

9   to take it, as I understand it.

10          THE COURT:  No, I think that's right.

11          MR. KAUFMAN:  I mean, you ask "mother, may I?" and

12   then they say whether they will or not.  And I guess it's up to

13   us to sort of frame the issue and to suggest -- and, you know,

14   my guess is that if we say this is going to significantly save

15   costs at this level, and ask Your Honor to adopt it, which

16   would be agnostic and neutral, just to recognize it on both

17   sides, that will probably help facilitate.  So, we'll try to

18   work on language about that.

19          MR. MUNGOVAN:  We agree, Your Honor.

20          THE COURT:  Well, I will state before I rule that I

21   think resolution of this issue will materially advance the

22   conduct of this litigation for all concerned.  I think

23   resolution of this issue will materially make it easier for all

24   of the courts because we've got this one proceeding set up.

25   We're going to have an appeal in this proceeding.  We'll have

1    one appeal instead of multiple appeals, and --

2         MR. KAUFMAN:  We'll so note in the proposed language

3    we send to you.

4         THE COURT:  So, I will -- I make those findings ahead

5    of time and I'll make them afterwards.  Mr. Phillips?

6         MR. PHILLIPS:  Well, one comment, Your Honor, was

7    brought to my attention, which I referred to before in our

8    statute of limitations brief.  I haven't had any discussions

9    regarding the stay of all actions, but we would ask -- that's

10   been fully briefed for awhile now, so we would ask that that

11   not be stayed by any potential ruling you would have on --

12        THE COURT:  We now have a stay in effect, is that

13   right?  Do we have a stay in effect pending this determination?

14        MR. BERNARDINO:  Your Honor, Colin Bernardino for the

15   trustee.  Yes, all adversaries are stayed, although you had

16   previously allowed defendants, I guess, to file dispositive

17   type motions.

18        THE COURT:  Right.

19        MR. BERNARDINO:  Which is why we have the statute of

20   limitations motions.  There is one to which the trustee has not

21   responded to yet, although I think the briefing is complete on

22   and it's four or five adversary proceedings, but otherwise,

23   those proceedings are stayed.

24        Your Honor may recall we came before you maybe two

25   months ago or so and had tried to set up a schedule to address,

**J&J COURT TRANSCRIBERS, INC.**

1  I guess, you know, maybe the trustee's prime facie case, and at

2  the time, you know, you said, well, let's wait and have the

3  briefing done but that we would, I guess, you know, revisit

4  that.  This may be the appropriate time to revisit that.  I

5  think it's the trustee's position that we'd like to go ahead

6  and -- you know, we don't see why we should stop or continue to

7  delay.  That that issue, no matter what the result of for-value

8  is, will need to be addressed.

9          MR. KAUFMAN:  You're referring to the statute of

10  limitations?

11          MR. BERNARDINO:  I am actually referring to the

12  trustee's prima facie case.

13          THE COURT:  So, you would want -- so, what?  You want

14  the cases to proceed at this point?

15          MR. BERNARDINO:  Your Honor, we had discussed

16  previously a method, and perhaps this miscellaneous proceeding

17  would be the appropriate venue, forum, in which we would open

18  up the books, allow the trustee to be deposed, you know,

19  ideally, only once.  It could be, you know, a multi-day event,

20  you know, but it would depend -- although it could certainly

21  work probably better if there was a joint defense group who

22  would lead the charge.  You know, that way, it doesn't, you

23  know, subject the trustee to multiple, duplicative depositions.

24          But, basically, you know, the trustee's position is

25  that, you know, with the cautionary, you know, things that have

1  been said, we believe that most of what we need to do to prove

2  up a Ponzi scheme has already occurred, at least from a

3  discovery standpoint, certainly, and so it would most be the

4  defendants taking discovery on this issue.  Give them 60, 90

5  days, allow them to take their discovery, either documentary,

6  interrogatories or deposition, or if there have to be a few

7  depositions, and then let's have a trial on that limited issue.

8              THE COURT:  On the Ponzi scheme issue?

9              MR. BERNARDINO:  Whether it existed.  Yes.

10             MR. KAUFMAN:  Your Honor, with all due respect to Mr.

11  Bernardino, I'm not sure -- and I have to talk to the

12  investors' committee -- but I understand Mr. Phillips' point on

13  the statute of limitations.  It's a legal issue and I don't

14  think it requires discovery and --

15             THE COURT:  Well, it's dispositive.  If the statute's

16  run, he's out.

17             MR. KAUFMAN:  Well, he's out and, you know, to the

18  extent that there is some definitive way that somebody can get

19  out on the statute of limitations, and the Court says it can't

20  go back as long as X, but can only go back as Y, I mean, that's

21  a pure legal issue which I don't think it's proper to frustrate

22  a party from doing.

23             That said, and I know I'm not in concurrence with the

24  trustee here so I'm wearing my investor committee hat, the only

25  thing I'm concerned about is if this value issue -- and I

**J&J COURT TRANSCRIBERS, INC.**

1   understand that the trustee takes the position that it has a

2   number of potential otherwise good faith issues so that it

3   wants to litigate a number of issues so that it can ultimately

4   get to good faith and argue that pretermitting the value or

5   even assuming arguendo, the value doesn't work, that the estate

6   can go ahead and collect.  And I'm not insensitive to the need

7   to move it ahead.

8          I am sensitive, on the other hand, to the expenditure

9   on both sides of Mr. Mungovan's group taking the discovery and

10  the estate spending money because both sides are now spending

11  money, whereas I think if the Eleventh Circuit decides the

12  issue -- and this, I'm pretty sure, is the position and I'm not

13  asking the Court to decide today and, frankly, what I'm going

14  to say is that maybe what we need to do is have a very short

15  briefing schedule, see whether we can reach agreement.  If we

16  can't, come back and present because the going up on

17  interlocutory appeal is one issue.  It seems to me it's a

18  separate issue as to what gets stayed.  We ought to see about

19  it.

20         But, my tentative thinking is, the investor's

21  committee is going to say, why spend money on that, because as

22  they view it, without prejudice to the good faith issue, if

23  value doesn't prevail here and on appeal, then the cost benefit

24  analysis may not be there to want to really support going

25  forward.  On the other hand, if we're prevailing, then full

 1 speed ahead.  And as much as we'd like to know now, and because

 2 we've been in it for three years, it just seems to me we would

 3 be spending a lot of fodder doing all that, that may be

 4 premature no matter how Your Honor rules until the Eleventh

 5 Circuit tells us, all of us, where we come out.

 6        But, again, I don't want to prejudice Mr. Bernardino,

 7 the trustee, or anybody else.  I just think, you know, having

 8 said what I've said preliminarily, we ought to see if we can

 9 reach agreement on it.  If not, brief it in a short time.

10        MR. BERNARDINO:  Your Honor, if I might respond?

11 We're certainly sensitive to these issues.  However, I don't

12 think Your Honor can guarantee when the 11th Circuit is going

13 to issue an order on any appeal, you know.

14        THE COURT:  No, I don't think I would try.

15        MR. BERNARDINO:  And, so, if Your Honor -- I mean, if

16 the plan committee is suggesting that we just wait a year, two

17 years, I think that's -- I don't think that's very wise from

18 the trustee's perspective.  And, you know, with all due

19 respect, Mr. Kaufman and the plan committee doesn't make the

20 decision as to whether the trustee continues to litigate this

21 matter.

22        MR. MUNGOVAN:  Thank you, Your Honor.  Just on behalf

23 of the Nixon Peabody clients which are Laird and the Curtis

24 family, because I'm not authorized to speak on this issue for

25 the other defendants, I agree with Mr. Kaufman on this issue.

**J&J COURT TRANSCRIBERS, INC.**

149

1    I think what I heard Mr. Kaufman say is that we could revisit

2    it at a period of time.  Maybe that period of time is 60, 90

3    days.  Once we see whether the Eleventh Circuit is willing to

4    take this matter and if we have some insight into how long it

5    will take to adjudicate at that level, we could come back, say,

6    at Thanksgiving or around that time and revisit this issue of a

7    stay.  And I think that that addresses Mr. Bernardino's concern

8    about hanging out there for a year.  So, that would be my

9    proposal.

10           I understand that Mr. Kaufman has to speak with the

11   investor's committee, but I think we should evaluate what the

12   investor's committee wants to do.  We can talk on the joint

13   defense side.  But, for my clients, we would advocate some

14   period of a stay that can be revisited after some reasonable

15   period.  Thank you.

16           MR. KAUFMAN:  I certainly respect Mr. Bernardino's

17   observation that it's the trustee's case to proceed with or

18   not.  But, you know, it is a function where the investor's

19   committee -- it's their money that's obviously at wait here

20   and, that said, I'm not trying to suggest how I come out on

21   this because how I come out is dependent up on how the

22   committee comes out.  So, it's a slight variation.  I think Mr.

23   Mungovan's idea of maybe an interim wait and see may be the

24   ultimate disposition.

25           All I was saying is today is not the day to agree

**J&J COURT TRANSCRIBERS, INC.**

1   what ought to be stayed and for how long.  I think we ought to

2   collectively talk amongst ourselves -- talk amongst yourselves,

3   to see whether we can reach a resolution about it that works

4   for everybody.  And, if not, come back on a very shortened

5   basis where Mr. Bernardino and the trustee will certainly have

6   the right to say what they want to propose.  Anybody else, if

7   we don't have an agreement, can say what they want on whether

8   it's the statute of limitations issue or on pressing ahead with

9   the case.

10          THE COURT:  Well --

11          MR. KAUFMAN:  And I'm not trying to protract this.

12  I'm just saying, you know, a couple of weeks, make sure we have

13  enough time, and then -- just my thought as opposed to trying

14  to wrangle it today because I really don't have authority to

15  speak as to what my client would want to do having heard what

16  Mr. Bernardino's idea is.

17          THE COURT:  Well, I can't -- what I would propose to

18  do would be, if the stay is extended at all, it would only be

19  extended to the extent that it now exists.  As I understand it,

20  that solves Mr. Phillips' clients problems, because those

21  things are proceeding.

22          MR. PHILLIPS:  Right.

23          THE COURT:  So, that doesn't affect him.  Then, so,

24  what I think may be helpful at this point is, you all talk

25  about this amongst yourselves for the next week or so.  If you

1  come up with a consensus of what you want to do, include it as

2  part of this order, the order part that you're going to do.

3  I'll probably do it as a separate order so that doesn't clutter

4  up the -- but you can put it in the same thing and I can cut

5  and paste it.  It doesn't much matter.

6         But, anyway, include that in there which would state

7  that the stay will be extended, as you all agree, subject to

8  any party in interest moving to have it terminated in their

9  particular case.  And what you -- in that regard, what you

10 might want to think about, though I'm cognizant of expense too

11 and I don't want to have everybody come down here for status

12 conference, after status conference, after status conference.

13 It's no big problem for me to go to a status conference when I

14 live right there.  But, we may want to just have a temporary

15 stay for 30 days, 60 days, and then a status conference at

16 which point we see where we are at that point.  That's a

17 possibility.

18        If you all agree on some other proceeding, that would

19 be certainly acceptable to me.  And then, if we need to have a

20 hearing -- I'm not really interested in briefly, quite frankly,

21 because I --

22        MR. KAUFMAN:  That was an unwise suggestion on my

23 part.

24        THE COURT:  Well, no, because I just don't --

25        MR. KAUFMAN:  It was to avoid running down here, but

**J&J COURT TRANSCRIBERS, INC.**

1  we got you.

2          THE COURT:  Whether to -- how long to stay something,

3  whether --

4          MR. KAUFMAN:  I know.

5          THE COURT:  I mean, that's not --

6          MR. KAUFMAN:  It's not fascinating.

7          THE COURT:  It's not helpful.  I can't get -- I have

8  to have a give and take and to really understand where the

9  parties are to really make an intelligent decision on that.

10          MR. KAUFMAN:  So, we'll report --

11          THE COURT:  So, that's got to be either a telephone

12  conference, which I'm happy to do if we can figure --

13          MR. KAUFMAN:  Right.

14          THE COURT:  There's a lot of people so that gets to

15  be a problem if we have a lot of people, but I'm certainly

16  happy to have -- to schedule a status conference and consider

17  it that way, but I'm not real interested in -- as good as all

18  your briefs were on the merits on this issue, I'm not real

19  interested in briefing on whether -- how long to extend the

20  stay.

21          MR. KAUFMAN:  That's good.

22          THE COURT:  Okay.  Anything else we need to do today?

23                  (No audible response)

24          THE COURT:  Okay.  Once again, I thank everybody.

25          MR. KAUFMAN:  Thank you, Your Honor.


                    **J&J COURT TRANSCRIBERS, INC.**

153

1          MR. MUNGOVAN:  Thank you, Your Honor.

2          THE COURT:  You all are excused.

3                     * * * * *

# C E R T I F I C A T I O N

          We, LORI AULETTA, AMY RENTNER, and CECILIA ASHBOCK,
court approved transcribers, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter, and to the
best of our ability.


/s/ Lori Auletta_____

LORI AULETTA


/s/ Amy Rentner_____

AMY RENTNER


/s/ Cecilia Ashbock_____     DATE:  September 10, 2009

CECILIA ASHBOCK

J&J COURT TRANSCRIBERS, INC.




**J&J COURT TRANSCRIBERS, INC.**